**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

Case No. 6:25-mc-00003-CEM-RMN

TALENTSCALE, INC.,

Plaintiff,

v.

AERY AVIATION, LLC,

Defendant.

_______________________________________/

**DECLARATION OF ERIC J. PONS**

Eric J. Pons hereby declares as follows under penalty of perjury:

1. My name is Eric J. Pons and being of lawful age and sound mind hereby depose and state as follows.

2. I am ccounsel of record for Plaintiff Talentscale, Inc. in the above-captioned matter. I have personal knowledge of the facts stated herein. I submit this declaration in support of Plaintiff's Opposition to Defendant's Motion for Protective Order.

3. On October 9, 2024, the United States District Court for the Eastern District of Virginia entered a $1,142,467.20 federal judgment against Aery Aviation, LLC in *Talentscale, Inc. v. Aery Aviation, LLC*, Case No. 4:24-cv-00033. ECF No. 2.

4. On January 13, 2025, Plaintiff registered the Judgment before the United States District Court for the Northern District of Florida, Case No. 5:25-mc-00001-TKW-MJF, pursuant to 28 U.S. Code § 1963 and initiated third-party discovery in aid of execution.

5. On January 21, 2025, Plaintiff registered the Judgment before the United States District Court for the Middle District of Florida, pursuant to 28 U.S. Code § 1963 and initiated third-party discovery in aid of execution. ECF No. 1.

6. On April 11, 2025, Plaintiff issued a subpoena to The Cleveland Clinic Foundation, one of Defendant's contractors, through the Northern District of Florida proceeding. Ex. 1 is a true and accurate copy of Plaintiff's April 11, 2025 Subpoena to The Cleveland Clinic Foundation.

7. On April 24, 2025, Defendant filed its Motion to Quash Plaintiff's subpoena issued to The Cleveland Clinic Foundation. Ex. 2 is a true and accurate copy of Plaintiff's April 24, 2025 Motion to Quash Subpoena.

8. On May 14, 2025, the Northern District of Florida entered its Order, denying Defendant's Motion to Quash, holding that "[a] party may not ask for an order to protect the rights of another party or a witness if that party or witness does not claim protection for himself, but a party may seek an order if it believes its own interest is jeopardized by discovery sought from a third person." The court concluded that, "[f]or this reason alone," such motions "must

be denied." Ex. 3 is a true and accurate copy of the Northern District of Florida's May 14, 2025 Order.

9. On May 23, 2025, the District Judge T. Kent Wetherell II of the Northern District of Florida held a hearing. Ex. 4 is a true and accurate copy of the Transcript of the May 23, 2025 hearing.

10. During the May 23, 2025 hearing, District Judge Wetherell asked Defendant's counsel:

> why hasn't -- why hasn't this debt been paid or some portion of it? I mean, it seems like [Aery] is a going concern business. Maybe they're a little behind on their bills, but they've got a pretty substantial line of credit that in very short order may get paid down by $921,000. Why isn't this judgment creditor getting a portion of the money?

11. Defendant's counsel responded to the District Judge as follows:

> But we've been very candid, and Aery just doesn't have it. If they had it, they would be trying to pay it. It's just not -- they just don't have it.

12. I obtained discovery and other documents from third-parties, not Defendant, showing that Scott Andrew Beale, a member and 55% interest holder in Aery, received distributions totaling $8,610,215 between 2022 and 2024, in addition to a salary,[1] and purchased a luxury residence for himself and his wife in Marco Island, Florida on March 19, 2022 for $1,250,000, and a

[1] Should the Court wish to examine these financial records, Plaintiff will seek leave to file them under seal, as certain documents were produced subject to a duly executed confidentiality agreement.

residence for himself and his sister, Christine Lannon, on September 27, 2023 for $550,000.

13. On February 6, 2022, Beale executed a sales contract to purchase 127 Gulfport Court, Marco Island, Florida 34145 for $1,250,000. Ex. 5 is a true and accurate copy of the February 6, 2022 sales contract.

14. On February 22, 2022, Beale and his wife, Jennifer Beale, and Nova Homes of South Florida, Inc. executed a residential construction contract to build their home at 127 Gulfport Court, Marco Island, Florida 34145 for $923,274. Ex. 6 is a true and accurate copy of the February 22, 2022 residential construction contract.

15. On February 28, 2022, Beale sent an e-mail stating that he and his wife were "preparing [their] home located at 6674 Gates Mills Blvd in Gates Mills, OH for sale" and would "relocate to Florida." Ex. 7 is a true and accurate copy of the February 28, 2022 e-mail.

16. On March 10, 2022, Beale sent a signed letter, stating that he was "purchasing land and building a house that will be completed mid-2023" and that he and his wife "intend[ed] to relocate [their] residency to Florida at that time." Ex. 8 is a true and accurate copy of the March 10, 2022 letter.

17. On March 19, 2022, the prior title holders for 127 Gulfport Court, Marco Island, Florida 34145 executed a warranty deed, transferring the

property's title to Beale. Ex. 9 is a true and accurate copy of the March 19, 2022 warranty deed.

18. On September 7, 2022, Imperial Marine Construction, Inc. recorded a notice of commencement on 127 Gulfport Court, Marco Island, Florida 34145. The notice was signed by Beale's agent. Ex. 10 is a true and accurate copy of the September 7, 2022 notice of commencement.

19. On December 15, 2022, Nova Homes of South Florida, Inc. recorded a notice of commencement on 127 Gulfport Court, Marco Island, Florida 34145. The notice was signed by Beale. Ex. 11 is a true and accurate copy of the December 15, 2022 notice of commencement.

20. On September 27, 2023, Beale and his sister, Christine Lannon, received title to 8334 Rimini Way, Naples, Florida 34114, which was purchased for $550,000. Ex. 12 is a true and accurate copy of the September 27, 2023, warranty deed and Collier County Property Appraiser summary.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 17, 2025.

By: *<u>/s/ Eric J. Pons</u>*
Eric J. Pons

# EXHIBIT 1

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida

| | | |
|---|---|---|
| Talentscale, Inc. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 5:25-mc-00001 |
| Aery Aviation, LLC | ) | |
| | ) | |
| *Defendant* | ) | |

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To: Cleveland Clinic, c/o C T Corporation System
1200 South Pine Island Road, Plantation, FL 33324

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: The documents requested in Exhibit A, attached to this subpoena.

| Place: Via email to epons@chaselaw.com and kchase@chaselaw.com | Date and Time: 04/28/2025 2:00 pm |
|---|---|

❐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 04/11/2025

*CLERK OF COURT*

_______________________________ OR /s/ Eric J. Pons

*Signature of Clerk or Deputy Clerk* *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Judgment Creditor Talentscale, Inc., who issues or requests this subpoena, are:

Eric J. Pons, Esq., epons@chaselaw.com, 951 Yamato Road, Suite 280, Boca Raton, FL, 33431

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## EXHIBIT "A"

## Definitions

These discovery requests should be construed in accordance with the following definitions and instructions:

1. **You** – When used in this subpoena *duces tecum*, the term "you" means the party receiving these discovery requests as well as any person acting on behalf of that party.

2. **Document** – When used in this subpoena *duces tecum*, the term "document" shall be construed in its broadest sense to include hard copy documents and documents in electronic form, including emails and text messages, and documents or information stored in, maintained on or accessible through computers, cloud drives, disk drives, or other electronic storage media.

3. **Communications** – When used in this subpoena *duces tecum*, the term "communications" shall be deemed to include all written or oral contact of any sort, whether by correspondence, telephone, text message, WhatsApp message, facsimile, email, over the internet, in person or otherwise.

4. **Relate, relating to, regarding, pertaining to and concerning** – When used in these discovery requests, the aforementioned terms mean anything about, referring to, discussing, describing, reflecting, revealing, containing, indicating, showing, evidencing, mentioning, bearing upon, comprising, identifying, dealing with, consisting of, constituting, or in any way pertaining, in whole or in part, to a subject.

5. This discovery request is continuing in character so as to require you to promptly supplement your response if you obtain further or different information after providing your response.

## Requests

1. Produce account statements for any financial accounts held by you in the name of or for the benefit of Aery Aviation, LLC, whose address is 1009 Providence Boulevard, Newport News, VA, 23602, including checking, savings, and investment accounts, from January 1, 2021 to the present.

2. Produce records of any wire transfers, ACH transfers, or funds transfers involving accounts held by you by or for the benefit of Aery Aviation, LLC, whose address is 1009 Providence Boulevard, Newport News, VA, 23602, from January 1, 2021 to the present.

3. Produce records of any wire transfers, ACH transfers, or funds transfers sent by you or on behalf of your accountholders to accounts held by Aery Aviation, LLC, whose address is 1009 Providence Boulevard, Newport News, VA, 23602, from January 1, 2021 to the present.

4. Produce invoices, payment records, and documents reflecting debts owed by you to Aery Aviation, LLC, whose address is 1009 Providence Boulevard, Newport News, VA, 23602, from January 1, 2021 to the present.

5. Produce contracts, agreements, or purchase orders between you and Aery Aviation, LLC, whose address is 1009 Providence Boulevard, Newport News, VA, 23602, from January 1, 2021 to the present.

6. Produce records of any loans or financing arrangements between you and Aery Aviation, LLC, whose address is 1009 Providence Boulevard, Newport News, VA, 23602, including repayment terms and outstanding balances, from January 1, 2021 to the present.

7. Produce documents identifying property, equipment, or other assets in your possession or control that belong to or are held for the benefit of Aery Aviation, LLC, whose address is 1009 Providence Boulevard, Newport News, VA, 23602, from January 1, 2021 to the present.

8. Produce correspondence or communications between you and Aery Aviation, LLC, whose address is 1009 Providence Boulevard, Newport News, VA, 23602, related to payments or account balances from January 1, 2021 to the present.

9. Produce records of garnishments, liens, or levies served on you concerning Aery Aviation, LLC, whose address is 1009 Providence Boulevard, Newport News, VA, 23602, identifying the creditor and amounts collected, from January 1, 2021 to the present.

10. Produce W-9 forms, tax identification documents, or corporate setup documents submitted by Aery Aviation, LLC, whose address is 1009 Providence Boulevard, Newport News, VA, 23602, from January 1, 2021 to the present.

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| TALENTSCALE, INC. | ) | |
| | ) | |
| Judgment Creditor, | ) | |
| | ) | Case No. 5:25-mc-00001TKW |
| v. | ) | |
| | ) | |
| AERY AVIATION, LLC | ) | |
| | ) | |
| Judgment Debtor | ) | |
| | ) | |

**MOTION TO QUASH SUBPOENA**

COMES NOW the Judgment Debtor, Aery Aviation, LLC ("Aery"), by counsel, and pursuant to Federal Rule of Civil Procedure 45(d) moves this Court to grant its Motion to Quash the Subpoena issued to the Cleveland Clinic by Judgment Creditor, Talentscale, Inc. ("Talentscale") on or around April 11, 2025. Aery provides its basis for the Motion and legal support in its Memorandum in Support filed contemporaneously with this Motion.

WHEREFORE, Aery respectfully requests that this Court grant Aery's Motion to Quash the Subpoena of Cleveland Clinic.

This 24thDay of April, 2025.

**Respectfully submitted,**
**Aery Aviation, LLC**

**By** _/s/ Rachel Rodriguez_

Rachel L.T. Rodriguez

FL Bar No. 110425
Vires Law Group, PLLC
515 N. Flagler Dr., Suite 350
West Palm Beach, FL 33401
Tel: (561) 370-7383
rrodriguez@vireslaw.group

Erin C. McDaniel (VSB No. 94884)
- *NDFL pro hac vice sought*
Davis, Burch & Abrams
555 Belaire Ave, Suite 340
Chesapeake, VA 23320
Tel: (757) 410-2293
erin.mcdaniel@davisba.com

*Counsel for Aery Aviation, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of April 2025, a true and accurate copy of the foregoing was electronically filed via the Court's CM/ECF system, which will send notification of such filing to the following:

Eric J. Pons
Chase Law & Associates PA
951 Yamato Road
Suite 280
Boca Raton, FL 33431
epons@chaselaw.com

Kenneth Chase
Chase Law & Associates, P.A.
1141 71st Street
Miami, FL 33141
kchase@chaselaw.com

_/s/ *Rachel Rodriguez*______

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**

TALENTSCALE, INC.

Judgment Creditor,

v.

AERY AVIATION, LLC

Judgment Debtor

Case No. 5:25-mc-00001TKW

**AERY AVIATION LLC'S MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS AND MEMORANDUM IN SUPPORT**

COMES NOW the Judgment Debtor, Aery Aviation, LLC ("Aery"), by counsel, and for its Memorandum in Support of Aery's Motion to Quash the Subpoena to Produce Documents issued to the Cleveland Clinic by Judgment Creditor, Talentscale, Inc. ("Talentscale") states as follows:

1. Plaintiff Talentscale is a judgment creditor of Aery Aviation pursuant to a judgment obtained in the United States Court for the Eastern District of Virginia on October 9, 2024.

2. In seeking to enforce its judgment, Talentscale has filed 32 subpoenas and 17 motions for writ of garnishment in this district alone, including subpoenas seeking document production from Aery's vendors.

3. In the more than dozen Motions for a Writ of Garnishment directed at financial institutions, Talentscale has represented to the Court that it believes the subject of the motion has collectible assets or funds in its possession.

4. However, as reflected in JP Morgan Chase and PNC Bank's Answers, many of these institutions do not have any accounts or other assets belonging to Aery. *See* **ECF Doc. Nos. 48 and 53**.

5. Rather than performing a good faith effort to collect a judgment, Talentscale appears to be engaged in a fishing expedition aimed at harassing any entity that could have a relationship with Aery.

6. One such entity, is the Cleveland Clinic. The Cleveland Clinic is nonprofit medical center based in Cleveland Ohio.

7. Aery is contracted to provide Critical Care Transport Services to the Cleveland Clinic on an as-needed basis. This involves transporting critically ill and injured patients along with medical providers and advanced medical equipment, such as full mechanical ventilation, diagnostic imaging equipment, and ventricular assist devices using fixed-wing aircraft.

8. On or about March 27, 2025, Talentscale filed a Motion for a Writ of Garnishment to the Cleveland Clinic in which it stated that Talentscale believes the Cleveland Clinic has collectible assts or funds in its possession. *See* **ECF Doc No. 44**.

9. Rather than wait for the Cleveland Clinic's response to the Writ to see if it does, in fact, have collectible assets in its possession, on or about April 11, 2025, Talentscale issued the subject subpoena.

10. Talentscale's subpoena seeks production of invoices, payment records, purchase orders, and communications related to payments from January 1, 2021 to present. A true and correct copy of the subpoena is attached hereto as **Exhibit 1**.

11. Federal Rule of Civil Procedure 45(d)(3)(A) specifies that a court must quash or modify a subpoena that requires the disclosure of privileged or other protected matter, or that subjects a person to undue burden.

12. To determine whether the subpoena subjects the recipient to an undue burden, courts must weigh the relevance of the subpoenaed information to the underlying litigation against the burden of producing and the recipient's interest in keeping the requested information confidential. *Westchester Surplus Lines Ins. Co. v. Portofino Masters Homeowners Assoc., Inc.*, 345 F.R.D. 532, 536 (N. D. Fla. 2024).

13. Importantly, "[t]he status of a person as a non-party is a factor that weighs against disclosure." *Fadalla v. Life Automotive Products, Inc.*, 258 F.R.D. 501, 504 (M.D. Fla. 2007).

14. Here, invoices, payment records, or communications related to same, dating back to 2021 are not relevant to identifying collectible assets currently in the

possession of the Cleveland Clinic. On the other hand, producing four years of such records would be burdensome for the Cleveland Clinic, which is not a party to this matter.

15. Additionally, given the nature of the services Aery provides to the Cleveland Clinic, documents responsive to the subpoena will likely contain individually identifiable health information protected by the Health Insurance Portability and Accountability Act ("HIPPA").

16. In return for little to no benefit to Talentscale, requiring the Cleveland Clinic to respond to the subpoena would serve only to sour the Cleveland Clinic's relationship with Aery.

17. In sum, the balancing test weighs against requiring the Cleveland Clinic to respond as it would subject it to an undue burden. Further, the court must quash a subpoena that seeks production of protected health information under FRCP 45(d)(3)(A)(iii).

18. Therefore, the Court should quash the subpoena.

WHEREFORE, Judgment Debtor, Aery Aviation, respectfully requests this Honorable Court to quash or modify Requests Nos. 5 and 8 of Talentscale's third party subpoena to Cleveland Clinic, and grant such other relief the Court deems just and proper.

**Local Rule 7.1(B) and (C) Statement on Conferral**

The undersigned certifies that, pursuant to Local Rule 7.1(B) and (C), co-counsel for Aery conferred with Eric Pons, counsel for Judgment Creditor, Talentscale, Inc., regarding its Third-Party Subpoena and this request to quash and/or modify same. Mr. Pons declined to withdraw the Third-Party Subpoena and opposes this motion.

**Local Rule 7.1(F) Certificate of Word Count**

The undersigned certifies that the word count established by Microsoft Word, beginning at the document title through the conclusion of this memorandum consists of 839 words, which does not exceed the 8,000 word limit.

Dated this 24th day of April, 2025.

**Respectfully submitted,**
**Aery Aviation, LLC**

**By**_*/s/ Rachel Rodriguez*_______

Rachel L.T. Rodriguez
FL Bar No. 110425
Vires Law Group, PLLC
515 N. Flagler Dr., Suite 350
West Palm Beach, FL 33401
Tel: (561) 370-7383
rrodriguez@vireslaw.group

Erin C. McDaniel (VSB No. 94884)
- *NDFL pro hac vice sought*
Davis, Burch & Abrams
555 Belaire Ave, Suite 340
Chesapeake, VA 23320

Tel: (757) 410-2293
erin.mcdaniel@davisba.com

*Counsel for Aery Aviation, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of April 2025, a true and accurate copy of the foregoing was electronically filed via the Court's CM/ECF system, which will send notification of such filing to the following:

Eric J. Pons
Chase Law & Associates PA
951 Yamato Road
Suite 280
Boca Raton, FL 33431
epons@chaselaw.com

Kenneth Chase
Chase Law & Associates, P.A.
1141 71st Street
Miami, FL 33141
kchase@chaselaw.com

_/s/ *Rachel Rodriguez*______

# EXHIBIT 3

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

TALENTSCALE, INC.,

Plaintiff,

v. Case No. 5:25-mc-1-TKW/MJF

AERY AVIATION, LLC,

Defendant.
____________________________________/

## ORDER

This matter is before this court on Aery Aviation, LLC's ("Aery") motion to quash Requests 5 and 8 of Talentscale, Inc.'s ("Talentscale") subpoena to the Cleveland Clinic Foundation. Doc. 57. Talentscale responded in opposition. Doc. 63. For the reasons set forth below, the motion is denied.

### I. Background

On October 9, 2024, Talentscale obtained a $1,142,467 judgment against Aery in the United States District Court for the Eastern District of Virginia. Doc. 57 at 3; Doc. 63 at 1. To collect on the judgment, on April 11, 2025, Talentscale served a subpoena on the garnishee, the Cleveland Clinic Foundation, that seeks, in relevant part:

- "contracts, agreements, or purchase orders between [the Cleveland Clinic Foundation] and Aery Aviation, LLC. . . from January 1, 2021, to the present"; and
- "correspondence and communications between [the Cleveland Clinic Foundation] and Aery Aviation, LLC, related to payments or account balances from January 1, 2021, to the present."

Doc. 57-1 at 3. The Cleveland Clinic Foundation responded that "Cleveland Clinic Foundation will respond to [these] request[s] following the Court's disposition of the Motion to Quash, and subject to a confidentiality/protective order." Doc. 61 at 4. The Cleveland Clinic Foundation, however, did not move for a protective order.

## II. Discussion

Rule 69(a) of the Federal Rules of Civil Procedure permits postjudgment discovery and states: "In aid of the judgment or execution, the judgment creditor . . . may obtain discovery from *any* person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(2) (emphasis added). "Rule 69 allows for broad discovery . . . ." 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3014 (2d ed. 2012); *see Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 138 (2014) ("The rules governing discovery in postjudgment

execution proceedings are quite permissive."). As one federal court stated:

> The creditor has the right to discover any assets the debtor might have that could be subject to levy or execution to satisfy the judgment, or assets that the debtor might have recently transferred. Broad discovery of a debtor's assets is permitted postjudgment—the debtor's assets, whether held individually or jointly, are relevant to collecting the debt owed.

*Pronman v. Styles*, No. 12-80674-CIV, 2016 WL 4613384, at *3 (S.D. Fla. Aug. 19, 2016). Thus, "it is not uncommon to seek asset discovery from third parties . . . that possess information pertaining to the judgment debtor's assets." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134 (2014). "Third persons may be examined about the assets of the judgment debtor so long as the motive is not to harass the third party." *Id.* at 208.

**A. Lack of Standing**

Aery first argues that the subpoena must be quashed because "producing four years of . . . records would be burdensome for the Cleveland Clinic" and "requiring the Cleveland Clinic to respond . . . would subject it to an undue burden." Doc. 57 ¶¶ 14, 17. Aery does not have standing to quash the subpoenas on the grounds of undue

burden placed on the Cleveland Clinic Foundation. *Auto-Owners Ins. Co. v. Southeast Floating Docks, Inc.*, 231 F.R.D. 426, 429 (M.D Fla. 2005) ("Defendants do not have standing to quash the subpoenas on the grounds of oppression and undue burden placed upon the third parties where the non-parties have not objected on those grounds."); *see* 8 CHARLES A. WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE CIVIL 2D § 2035 ("A party may not ask for an order to protect the rights of another party or a witness if that party or witness does not claim protection for himself, but a party may seek an order if it believes its own interest is jeopardized by discovery sought from a third person."). For this reason alone, Aery's motion must be denied.

**B. <u>Aery Has Not Demonstrated a Lack of Relevance</u>**

Aery also argues that the materials Talentscale requests are not relevant to Talentscale's efforts to collect on the judgment. But the Cleveland Clinic Foundation stated it was indebted to Aery "for services rendered in the total amount of $126,434.97 . . .." Doc. 59 ¶ 1. The records sought by Talentscale are relevant to identifying income streams, accounts receivable, and other financial assets that may be seized to

satisfy the judgment. For this reason, as well, Aery's motion must be denied.

**C. <u>The Health Insurance Portability and Accountability Act</u>**

Finally, Aery asserts that the responsive documents may contain individually identifiable health information protected by the Health Insurance Portability and Accountability Act ("HIPAA"). Doc. 57 ¶ 15. Talentscale asserts that it does not seek any information protected by HIPAA. Doc. 63 at 2.

HIPAA generally prevents disclosure of protected health information. Disclosures, however, may be made in a judicial proceeding when the covered entity receives reasonable assurance that the requesting party has made reasonable efforts to obtain a qualified protective order, that (1) prohibits the parties from using or disclosing the protected health information for any purpose other than the litigation or proceeding for which such information was requested; and (2) requires the return to the covered entity or destruction of the protected health information (including all copies made) at the end of the litigation or proceeding. 45 C.F.R. § 164.512(e)(1)(v).

Because responsive documents might contain identifiable health information, and because a qualified protective order would obviate concerns regarding HIPAA—which Aery has raised in each of its three motions to quash—Talentscale and Aery will confer and submit to this court a joint motion for a qualified protective order that complies with 45 C.F.R. § 164.512.

## III. CONCLUSION

For the reasons set forth above, it is **ORDERED:**

1. Aery Aviation, LLC's motion to quash, Doc. 57, is **DENIED**.

2. On or before **May 22, 2025,** Talentscale and Aery shall confer to discuss a qualified protective order.

3. On or before **May 28, 2025**, the parties shall file a joint motion for a qualified protective order. The motion must include the proposed protective order and proposed order adopting the motion.

**SO ORDERED** this 14th day of May, 2025.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| TALENTSCALE, INC., Plaintiff, | ) Case No: 5:25-mc-00001-TKW |
| v. | ) Pensacola, Florida, Florida<br>) May 23, 2025<br>) 9:38 a.m. |
| AERY AVIATION, LLC, Defendant. | ) |

**TRANSCRIPT OF TELEPHONIC HEARING**
**BEFORE THE HONORABLE T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 49)**

APPEARANCES:

For Talentscale, Inc.: Chase Law & Associates
by: **ERIC J. PONS**
951 Yamato Road
Suite 280
Boca Raton, Florida 33431
(305) 402-9800
*epons@chaselaw.com*

For Aery Aviation: Davis, Burch & Abrams
by: **ERIN C. MCDANIEL**
555 Belaire Avenue
Suite 340
Chesapeake, Virginia 23320
(757) 410-2293
*erin@davisba.com*

For Aery Aviation: Vires Law Group
by: **RACHEL L.T. RODRIGUEZ**
515 N. Flagler Drive
Suite 350
West Palm Beach, Florida 33401
(561) 370-7383
*rrodriguez@vireslawgroup.com*

For the Cogent Bank: Greenberg Traurig
by: **COURTNEY M. KELLER**
**SAVANNAH YOUNG**
450 South Orange Avenue
Suite 650
Orlando, Florida 32801
(407) 254-2610
*Kellerc@gtlaw.com*

For the HSBC Bank USA: Carlton Fields
by: **MERRICK L. "RICK" GROSS**
2 Miami Central
700 NW 1st Avenue
Suite 1200
Miami, Florida 33136
(305) 530-4046
*mgross@carltonfields.com*

For Cleveland Clinic Foundation: Stearns Weaver Miller
by: **DARRIN J. QUAM**
Truist Place
401 East Jackson Street
Suite 2100
Tampa, Florida 33602
(813) 222-5109
*dquam@stearnsweaver.com*

**P R O C E E D I N G S**

*(Call to Order of the Court.)*

*(Proceedings commenced at 10:00 a.m.)*

THE COURT: All right. Good morning. This is Case Number 5:25mc1, Talentscale versus Aery.

Why don't we begin with appearances, and I'll run through the list.

For Talentscale, who do we have?

MR. PONS: Eric Pons on behalf of plaintiff. Thank you, Your Honor.

THE COURT: All right. And for Aery, who do we have?

MS. MCDANIEL: Erin McDaniel.

MS. RODRIGUEZ: Rachel Rodriguez.

THE COURT: So McDaniel and Rodriguez, correct?

MS. MCDANIEL: Yes, Your Honor.

MS. RODRIGUEZ: Yes, Your Honor.

THE COURT: And then for Cogent, who is here?

MS. KELLER: Good morning, Your Honor. This is Courtney Keller with Greenberg Traurig. One of my colleagues, Savannah Young, may also be on the line. I'm not sure if she was on before I joined.

MS. YOUNG: Yes. Savannah Young is here also on behalf of Cogent. Thank you.

THE COURT: All right. And is somebody from -- I think there were some other folks as well. HSBC, somebody I

believe appeared?

MR. GROSS: Yes. Yes, Your Honor. Good morning. Rick Gross with Carlton Fields.

THE COURT: All right. And then the last one I think I heard was somebody from the Cleveland Clinic Foundation.

MR. QUAM: Yes, Your Honor. Darrin Quam with Stearns Weaver Miller for them.

THE COURT: All right. Was there anybody who appeared on behalf of anyone else that I missed?

*(No response.)*

THE COURT: Mr. Gross, you're certainly welcome to attend and participate as you need it, but as I would understand it, you really don't have a dog in this fight, do you?

MR. GROSS: That's correct, Your Honor. I just wanted to make sure nothing came out of the hearing that affected us, but we do not have a dog in the fight.

THE COURT: All right. Then I will probably ignore you, unless you get my attention and say you need to be heard about something, okay?

MR. GROSS: Absolutely, Your Honor. Thank you.

THE COURT: All right. And Mr. Quam, from the Cleveland Clinic's Foundation, you obviously have a dog in the fight because the garnishment writ has been issued to you, you've answered it, you filed an amended answer to it, but from your perspective, all you need to know is where to send the

money, right?

MR. QUAM: Correct. We're just waiting for the Court's instruction on what to do.

THE COURT: Okay. But you don't anticipate having any argument related to the Motions to Dissolve and things of that nature, correct?

MR. QUAM: Correct, Your Honor. We have nothing to say on that.

THE COURT: All right. So I guess the bulk of the argument will be between Talentscale and Cogent, I guess primarily; but Aery, since at some level this is or is not your money, I assume you have something to weigh in on as well, and I guess you filed a motion.

So why don't we do this. As I understand what we have pending at the moment, so the Cleveland Clinic filed an answer and then an amended answer to the writ of garnishment identifying at this point about $976,000 that they have that they owe to Aery.

There's been a Motion to Quash that writ filed by Aery and Cogent, and one of the two of you -- looks like Cogent -- supplemented it, your Motion to Quash.

I was waiting for a response to the Motion to Quash, and instead I got a Motion for Extension of Time to respond to the motion, and then a response to that. And then in the meantime, there's also a motion to compel discovery which I

guess was referred to in the response.

So we've got a lot to talk about. Maybe the first -- we'll start with what we're primarily here on, I guess, is the Request for Extension of Time to Respond to the Motions to Quash -- or Motions to Dissolve because as I understand kind of the essence of the argument on the Motion to Dissolve is that the money that Cleveland Clinic has owes to Aery actually is spoken for by Cogent Bank through some priority interest.

And from what I understand, Mr. Pons, you don't think you have enough information to know whether that's true or not. So I'll start with that. And if I misstated the background, you can correct me, and then you can make whatever argument you want to make on your Motion for Extension of Time.

MR. PONS: Thank you, Your Honor. And if it's okay with you, I just prefer getting to the Motion for Extension of Time. I would just like to provide you with a brief background of the case since this is our first appearance before you.

THE COURT: Sure.

MR. PONS: So Talentscale -- is that okay, Your Honor?

THE COURT: Yeah, go ahead.

MR. PONS: Thank you.

So Talentscale holds a $1.1 million federal judgment against Aery Aviation LLC for unpaid staffing services. That judgment was entered by the United States District Court for the Eastern District of Virginia. To date, Aery has not paid a

single dollar on that judgment.

Shortly after Talentscale began providing services and while Aery was already falling behind on its invoices, Cogent Bank extended a $9 million revolving line of credit to Aery to provide working capital. That line was later increased to 15 million. None of those funds were used to pay my client's overdue and unpaid invoices.

We initially sought to force the judgment in the Eastern District of Virginia but after Cogent Bank responded to a garnishment there and challenged the court's jurisdiction, we registered the judgment here in the Northern District of Florida where Aery has additional contractors and financial connections.

So as part of the collections process, we issued subpoenas to third parties holding Aery's assets including Cogent Bank. The subpoena to Cogent is in the record as docket entry 78-3 if you'd like to take a look at it.

In response, Cogent asserted a bunch of objections and we conferred and then they agreed to produce some bank records, loan documents and agreements. And then, however, Cogent Bank did refuse to produce records, what is known as the blocked account, an account where Aery effectively has agreed to deposit all of its receivables to date.

And so initially Cogent Bank withheld accounting records showing Aery's loan payment obligations and amortization table showing what Aery owes Cogent each month.

Yesterday Cogent's counsel agreed to produce the accounting records and amortization tables. We were able to narrow the dispute to a single issue. Cogent is effectively refusing to produce bank records and correspondences for what is known as the blocked account.

And as I mentioned earlier, under the blocked account agreement the -- under the blocked account agreement with Cogent, Aery is required to deposit all of its receivables into that account.

And so the disputed request that relate to that -- to those bank records, if Your Honor would like to take a look, are 1, 2, 6 and 7 in docket entry 78-3. Request 1, 2 and 7 request standard bank records, account statements, wire confirmations and delayed correspondences concerning accounts held by for the benefit of Aery.

Request 6 asks for documents identifying Aery's assets held by Cogent. These records are critical to determine what -- how exactly Aery's -- how much Aery is collecting, where the money is going and whether there have been any transfers --

THE COURT: All right. Let me -- let me stop you for a second. Because I think you're getting into your motion to compel. And I understand why you're getting into that to try to answer my question of why you can't -- why you don't --

MR. PONS: Yeah.

THE COURT: -- know now that this money is already

spoken for. And I guess I'm -- I think you might very well be entitled to all that information to try to track down where Aery has money that's not spoken for, but I'm not sure that any of that information changes the fact that this Cleveland Clinic money is subject to all of these loan documents and security agreements and in effect is Cogent's money at this point.

So how does all that information -- would any of that information change that seemingly undisputed fact?

MR. PONS: So Cogent's taking the position that it's entitled to the full amount of the 900,000 or so from -- from Cleveland Clinic to pay for its outstanding debts. But we're taking the position that they're only entitled to what is actually owed per month. So to the extent it's less than the 900,000 and change, our client is entitled to that difference. And so we need documentation, like the amortization tables and the actual bank statements, to show, okay, what's actually in that account and what can be paid for as what's owed and, you know, what's the surplus.

THE COURT: Well, let me interrupt you.

MR. PONS: That's why we need the documents.

THE COURT: Hold on, let me stop you again. As I understand, and maybe I'm just not understanding, but as I understand the business loan agreement, there are two different types of advances that Aery and its other groups associated with it are the borrowers. And I guess that's another issue here,

borrower is defined to include all four of these agencies not just Aery.

But in any event, the borrower can take two different kinds of advances. One are -- just look like operating type advances. And I'm looking specifically at Section 2.01(c), Roman numeral (i) looks to me to colloquially as kind of operating advances and then (ii) is advances when they're buying aircraft or aircraft equipment.

And as I kind of pieced all these things together, all of those sub loans and amortization tables and everything else that you're talking about, only are dealing with (ii) when they're buying aircraft, that their day-to-day money that's -- they're pulling out against that $15 million isn't subject to any sort of amortization. It's just -- it's due immediately.

And when money comes in, like these Cleveland Clinic dollars, the balance that they owe goes down. When they draw money out pursuant to their subsection (i), the balance they owe goes up. And every month the observable thing they're obligated to pay is an interest payment on just the routine -- the total balance of this.

Am I misunderstanding what's going on here?

MR. PONS: Which page are you referring to, Your Honor? I was trying to run over to it.

THE COURT: I'm looking at the -- I don't have the document number but it's the business loan agreement, page 8 of

35, it's under Section 2.01(c), procedure for advances. And it takes about two different types of advances.

And then if you want to dig a little further, if you look at the note, and this is the -- it has a bottom Exhibit 6. I don't know what it's Exhibit 6 to, but it's the amended and restated revolving line of credit. Page 2 of that talks about what they pay every month, and it's essentially interest only. And then they talk about the repayment of those draws under the 84-month amortization schedule separately. But unless I'm missing something, that only relates to aircraft purchases, not to their operations.

So again my ultimate question is how does anything you're asking for -- and again you may very well be entitled to it, because there's obviously money they've got coming in to pay the interest at least and the annual fee that they have to pay for this resolving line of credit. It's got to be coming from somewhere and you probably have a right to find out where it's coming from and try to attach it.

But I'm struggling to understand how any of that information is going to answer the question or is going to change the answer to the question that the Cleveland Clinic money is already spoken for.

MR. PONS: So in the last sentence on that page you're referencing in paragraph 2.01(a), it says that the line of credit shall be evidenced by the revolving line of credit

promissory note. And so, you know, we're traveling under the terms in that note for purposes of when the actual payments or any of the advances were due.

And then in -- in the actual revolving line of credit promissory note, it says that the major shall be paid each draw period total in monthly payments of principal and interest, which payment shall be based upon 84-month amortization schedule calculated on the applicable draw period.

THE COURT: Right, but --

MR. PONS: Based off of that --

THE COURT: But when you look at draw period total, that's a defined term that's the aggregate of all aircraft equipment advances, which is a defined term, which is an advance made for eligible aircraft or aircraft equipment. And that's a defined term back in the business loan agreement which takes us back into sub (ii), (c)(ii), which again unless I'm missing something, the only thing they're required to actually pay principal on pursuant to that amortization schedule is when they buy aircrafts or aircraft equipment, that they're not actually paying any principal on the rest of that loan, whatever that number is, that's based on the operational draws that they're -- advances that they're taking. All they're paying is that monthly interest.

And somebody gave me a balance summary, billing summary from Cogent Bank that said as -- on March 30th, which is

the last -- presumably last business day of that month, consistent with the business loan agreement, they owe $176,232.18, which I guess is interest.

MR. PONS: So I guess the issue that we're having is I -- I'm not sure exactly what Cogent is traveling under when it's seeking that amount and that would -- you know, if we could have Cogent weigh in on that, that would be very helpful.

THE COURT: Okay. Well, let's do that and I'll --

MR. PONS: We can better -- better understand. Yeah.

THE COURT: By the time we finish today everybody will have had the opportunity to say everything they want to say, but I'm just still trying to understand these loan documents that I'm looking at. And we'll go to Cogent, so that is Ms. Keller.

So Ms. Keller, I guess the --

MS. KELLER: Yes, Your Honor.

THE COURT: -- first question I have for you, am I reading these advances correctly that there's two kinds of advances and the only thing they're paying principal on pursuant to any sort of amortization schedule is when they buy eligible aircraft or equipment?

MS. KELLER: Yes, Your Honor. I think you're reading that right, and the -- the sub notes are tied only to the individual aircraft draws. And each aircraft secures the draw. It's got a corresponding chattel mortgage which isn't really relevant here, but -- and then each sub note has its own

amortization schedule. But you're reading -- you are reading the agreement right.

THE COURT: Okay. So then take me to that, and it looks like it's Document 67-2. And I'm not sure who filed it, but it's a -- looks like an account statement that, please return the bottom portion with payment to Cogent Bank. And on May 30th, it said that there's $176,232.18.

My assumption was that that is the interest only payment that's required based on the balance of the line of credit. Is that a correct or incorrect understanding?

MS. KELLER: Let me get to that document. That wasn't filed by Cogent. I think that -- it looks like that's probably an affidavit that was filed by Aery. And maybe Aery's counsel would be best to discuss that. But let me get to it first. Okay, this is 68-2.

THE COURT: Yes, ma'am.

MS. MCDANIEL: Yes, it was attached to our Motion to Dissolve the Writ just to show that was -- that is interest only payment as I understand it as well. You can also see that the principal balance on that is 11 million. I mean, there's not -- it's far more than $176,000 due to Cogent at the moment.

THE COURT: And that was Ms. --

MS. KELLER: Yeah, that was --

THE COURT: -- McDaniel?

MS. KELLER: -- (unintelligible) of the interest.

MS. MCDANIEL: Yes, Your Honor.

THE COURT: Okay. Before I get off, Ms. McDaniel, then the other numbers on that, it shows a couple of different numbers. One is an $11.1 million principal balance and then there's some other principal balances of 425,000 and 3.3 million. What is the difference there? I'm assuming the 11 million is the total amount of line of credit that's drawn out. What are the other numbers?

MS. MCDANIEL: That's a great question, and that's -- I think those are just under a different account, but it's still loans. These are loan balances that are owed under a separate account that total altogether I believe. That's why it was all put on one statement.

THE COURT: And --

MS. KELLER: Your Honor, if I may, I believe --

THE COURT: Go ahead, Ms. Keller.

THE WITNESS: I believe that the top line there for the $11 million balance is the revolving line of credit -- well, I think all of these are balances under the revolving line of credit. The two bottom ones, I believe the 425 and the 3 million, relate to the sub notes. The revolving line of credit is fully funded right now in the amount of about $15 million.

So I think if I'm reading that correctly, that's what that is. And I'm not a hundred percent sure because I haven't

spoken to my client directly about this particular document, but I think that that -- that's what is going on with it.

THE COURT: And just doing the math, it looks like that 11 million plus the 3.88 million gets you to that 14.9 million number, if my quick math is right. So that would make sense.

MS. KELLER: Yeah.

THE COURT: So the representation is that there's $11.1 million of draw or advances just for operations and that there's $3.8 million of draws for aircraft equipment that are subject to sub notes.

Is that a fair understanding, Ms. Keller?

MS. KELLER: That is what my understanding is. Again without having actually discussed this document with my client, that's what my understanding is.

THE COURT: Okay. And again we may be getting a little far afield of where we are at this particular moment, but just to help me understand things, Ms. Keller, there's -- looking at the business loan agreement, Section 5.12 requires the borrower to establish an account with Cogent that has a minimum average daily cash balance of half a million dollars.

And my assumption is based on the responses that you filed to the discovery and whatever else that you've responded to, that there is no such account.

MS. KELLER: There is an operating account, but it

has -- it does not have $500,000 in it. It's either -- I don't know what the balance in it is today. I can't say that, but I know at the time that we served the -- at the time that we -- we were served with the writ of garnishment is the time we answered the writ of garnishment. It either had a zero balance or a negative balance.

THE COURT: So if that's the case, they're in breach of the agreement at this point because they don't have that and they're supposed to?

MS. KELLER: Yes, that's -- I think that would be accurate. I don't know that Cogent has told them they're in breach because of that yet but that -- that provision of the loan agreement certainly has not -- is not being complied with right now.

THE COURT: And the other thing that's a little bit confusing about all this is the -- all of these agreements define borrower to be four different entities. I assume they're all related in some way. But is the representation that not only does Aery not have a $500,000 account sitting at Cogent Bank, but neither of these other three related entities have it either? Is that the representation?

MS. MCDANIEL: And, Your Honor, can I -- Your Honor, if I might jump in here real quick regarding the other entities just for purposes of clarity.

THE COURT: Is this Ms. McDaniel again?

MS. MCDANIEL: Yes, Your Honor.

THE COURT: Okay, go ahead.

MS. MCDANIEL: Flight Support, Inc. and Electronic Warfare Training Support were individual separate entities that several years ago were acquired by Aery, but they must have been still existing at the time of the loan agreement, but they were fully acquired by Aery. They do not any longer have any independent operating. And then Strategic Airborne Operations JV, LLC, the joint -- was a joint venture agreement between Aery and another aerospace company for the purposes of bidding on and performing on a contract for the United States Navy.

Aery has since bought out the other entity in that joint venture, and the contract on which it was performing ended as of May 12. So as of May 12 there are no longer any operations under Strategic Airborne Operations although at the time it was still wholly owned by Aery. So just to clarify all that, for what that's worth.

THE COURT: Okay. So I think what you're telling me at this point is even though there are four borrowers named on all these documents, at this point the only surviving entity of those group is Aery. Is that what you're telling me?

MS. MCDANIEL: That's -- yes, Your Honor, that's correct.

THE COURT: Okay. I guess the other question I have, and again maybe little far afield of where we need to be at this

point, but there was a bill that we've been talking about for $176,000 of interest. This was back on March 30th. Was that bill paid?

MS. KELLER: I think I can answer that, Your Honor. Let me -- I think my client just let me know something yesterday, unless Ms. McDaniel may know off the top of her head.

MS. MCDANIEL: I do not know off the top of my head.

MR. PONS: This is the kind of information that we're seeking, Your Honor, by the end of discovery just to get clarity on these points to properly view and oppose these motions so.

THE COURT: Yeah, okay.

MS. KELLER: Okay. Yesterday my client had let me know and -- and by the way, I mean, this wasn't something we could have produced in discovery because it wasn't -- we responded to that subpoena before, you know, today. But we did -- I did send Mr. Pons a schedule of the payments and of -- of the payments due and the payments made under the loans I sent him that yesterday. It was in the form of like an Excel spreadsheet because that -- it's my understanding that -- and -- and I'm glad that I just saw that interest statement that was -- that Aery had attached to it, affidavit, because now I can use that with the client. But I did send him a schedule that shows, you know -- yesterday that shows the payments that were due under the loans and the payments that were made.

And as of yesterday what my client had informed me was

that as of April, 2025, Aery was 30 days past due on their loan payments for all three of the facilities. And so that was as of April. So I am guessing that March payment has not been made.

THE COURT: Okay.

MS. KELLER: (Unintelligible.)

THE COURT: All right. Here's I guess where I'm coming from and where I'm going here. I'm struggling to see -- and again, Mr. Pons, I'll certainly give you an opportunity to try to persuade me, but I'm not sure that any of this information that you're seeking is going to change what appears to be an undisputed fact that the amount that Aery owes on this line of credit just for their operation side far exceeds the amount of money that Cleveland Clinic owes, and that that money would then all go to Cogent Bank. It's already been spoken for to pay down the operational draw. And so I just -- I'm struggling to understand how anything you're asking for is going to change that fact.

That said --

MR. PONS: No.

THE COURT: Hold on and then you can respond.

That said, it does seem like they had to at some point be paying interest on that account from somewhere. They've got to be -- the money doesn't grow on trees, and unless they're just drawing down the -- or pulling advances to pay the interest, which seems kind of like we're -- a death loop, but in

the event that they were finding money somewhere to pay the 176,000, for example, and I know that one may not have been paid but those monthly interest payments, I think you're probably entitled to get the information to find out where that money was coming from because that money, presumably at least, wasn't spoken for because it's coming from outside of an account receivable, it's coming from outside money that Cogent Bank has an interest in.

So help me understand why that's not the right answer, the answer being these writs would be dissolved so that money can go to Cogent Bank to pay down the line of credit, but you may very well get the discovery you're looking for to try to track down where, if anywhere, there's a pot of money that hasn't been spoken for.

MR. PONS: So you may very well be right, Your Honor, and I won't dispute that it's what everybody's representing here today is correct. Then -- then that is likely -- you know, that's (unintelligible) which should take place.

My concern is that, you know, everyone is saying, oh, I have to speak to my clients, you know, we're not entirely sure. So we're just asking for, you know, just a short amount of time to be able to get whatever documentation to definitively establish these numbers.

And then to the extent, you know, there's a valid basis to seek to dissolve, then we would within, I don't know,

five days of when we get those documents we'd be able to oppose it to the extent we have a basis to do so.

That's all we're asking for, Your Honor. Like obviously if everyone's -- like I was saying, if what everyone is saying here is correct then I agree.

THE COURT: All right. Let me ask another question here. And, Mr. Quam, just to be sure you're still awake, you listed in your answer about $126,000 worth of invoices that you want to pay to Aery through Cogent Bank. Then in the amended answer it bumped up to 921,000. The inference that I took from that is that there's a fairly regular ongoing business relationship between Aery and Cleveland where Aery is doing a lot of work for you and you're incurring a lot of costs that this is a regular ongoing thing.

Is that a fair inference or is this 924 -- 21,000 the end of the relationship, and there's not going to be any more invoices coming down the road?

MR. QUAM: It's a fair invoice -- fair inference that they do regular business with each other, Cleveland Clinic and Aery, but it bumped from 100,000 to 900,000. It's not there because under the law we're -- we just have to -- it's cut off at the time that the writ was served. So we're not going beyond that, Your Honor.

So the thing wasn't -- the hundred thousand was just inaccurate. The initial calculation of how much they were

holding at a hundred thousand was just inaccurate. The correct number was 921,000 or whatever the amended answer reflected. So that was the -- that's the explanation there.

THE COURT: Okay. And I guess the -- where I'm going with the question is if this writ is dissolved, if another one was issued a week from now, would there be another $900,000 or what is the volume of business that's being done?

I mean, I guess if there's an income stream that I say today I'm persuaded is Cogent's, but additional evidence develops and I become unpersuaded of that fact, is there an income stream coming in from Cleveland Clinic that we could have this debate down the road, or is it unlikely that it's going to be that large of a number?

MR. STPHAO: It depends, Your Honor. Aery -- the helicopter service that provides services connected with organ donors so it's hard to predict, you know -- we know that there is a usual course of business that is regularly providing those services, but we don't know exactly how much that's going to be.

For example, if Your Honor dissolved the writ then Cleveland Clinic would be obligated to release the funds to Cogent Bank or Aery or wherever they've been spending it. And then if they serve another writ of garnishment that would just start the process again.

THE COURT: Okay. All right. That's fair enough.

And before I kind of get back to --

MS. MCDANIEL: My understanding --

THE COURT: Who is this?

MS. MCDANIEL: I'm sorry. My understanding -- this is Erin McDaniel. My understanding, Your Honor, is that Cleveland Clinic pays these invoices directly into that blocked account with the understanding that that money doesn't actually belong to Aery.

MR. QUAM: That would comport with the terms of blocked account agreement.

THE COURT: All right. I guess the other kind of big picture question I have, and again it's a little beyond where we are today, but why hasn't -- why hasn't this debt been paid or some portion of it? I mean, it seems like this is a going concern business. Maybe they're a little behind on their bills, but they've got a pretty substantial line of credit that in very short order may get paid down by $921,000. Why isn't this judgment creditor getting a portion of the money?

Ms. McDaniel or Ms. Rodriguez, why aren't you paying your debt here?

MS. RODRIGUEZ: Your Honor, I understand -- I certainly understand and I think your question and part of the confusion here for us is that we've been trying to have some conversations with about reaching -- potentially reaching a settlement. But we've been very candid, and Aery just doesn't have it. If they had it, they would be trying to pay it. It's

just not -- they just don't have it.

Cogent is a first priority lienholder on all of Aery's accounts receivables, but they're the only ones. And Talentscale isn't the only one either. And unfortunately what -- Aery was in a position where they were performing on a Navy contract and due to, you know, changes in the way that we had our military deployed, the operations under that contract were substantially cut down, about 75 percent cut down, reducing the cash flow that Aery had to -- you know, by about 75, 80 percent which is huge.

It's just not something that Aery has pulled out of yet. That's been a couple of years now that Aery's been kind of trying to stay afloat, but we're in a -- I mean, Aery is definitely toeing the line at this point of potentially restructuring. It's not -- it's not lack of desire to pay a debt. It's lack of ability to do so. Notwithstanding, it doesn't mean that the -- you know, the account sales and how it owes some money that is owed to other priority creditors.

THE COURT: And I -- I understand that and accept that, and particularly if the representation is accurate that they're 30 days behind on their loan agreements, that may be -- that reality may be coming sooner rather than later because I'm sure Cogent Bank doesn't like having a $15 million liability sitting out there with it not being paid.

But if the number is 15 million right now and this

writ of garnishment is dissolved, there's 921,000 that gets paid down immediately and so you're -- you've got $921,000 on your line of credit to play with that you didn't have before. And it just seems to me that you may have other creditors out there, but this one appears to be the one that's agitating, at least most loudly and at least most loudly in front of me, and it seems like there would be an opportunity to figure out how to weave them into the operations because looking at the business loan agreement -- you know, the purpose of line of credit is to provide for ongoing working capital to support current and future contracts and provide the funding for purchase of new aircraft.

And I don't see any reason why this debt which was incurred in the course of this judgment, which was incurred in the course of supporting their business, why that wouldn't fall within the scope of a proper use of the money.

So there's a lot of smart people on this phone call and I'm sure if you put your heads together, you could figure out a way to start getting these folks paid so they stop bothering you, stop bothering your client, stop bothering everybody else, and you can move on with trying to dig yourself out of the hole.

So that's just a nickel's worth of free advice, but I think that's probably pretty good advice. Otherwise, somebody needs to pull this company into bankruptcy and get all of this

sorted out, get them a fresh start and move on with life. But it certainly seems a little -- I understand what you're saying, but it -- you know, a little bit of an alligator tears if, in fact, they're doing hundreds of millions of dollars of government contracting and I'm sure these executives aren't working for free, it certainly seems like that there's a way to solve this problem. But that's for y'all to figure out, not me.

So Mr. Pons, I'll give you the last opportunity to persuade me that I shouldn't do what I think I'm going to do.

MR. PONS: Your Honor --

MS. MCDANIEL: Your Honor --

THE COURT: Okay. Hold on.

MS. MCDANIEL: I don't mean to interrupt.

THE COURT: Yes, ma'am, go ahead.

MS. MCDANIEL: I don't mean interrupt but I just wanted to briefly ask for an opportunity to say one thing. I can wait till after Mr. Pons goes or go now but I didn't want you to hang up.

THE COURT: Go ahead. You can have it. We'll give Mr. Pons the last word.

MS. MCDANIEL: Okay. I just wanted to clarify one thing. I was able while we were sitting here looking through my files -- and we did produce that, the billing summary that was -- we were talking about that was attached to the affidavit of Aery. And we've produced that and the unredacted version

that I'm looking at which I believe was produced to opposing counsel that way -- or to Talentscale counsel shows that that top line account, that $11 million balance relates to the account number that is associated with the operating line of credit.

The two on the bottom are relating to the accounts associated with the sub notes. So that $11 million balance based on the records we have produced to Talentscale earlier in this case is -- does reflect that that $11 million balance relates to the line of credit.

THE COURT: All right. Thank you for that clarification.

All right. Mr. Pons, go ahead.

MR. PONS: Your Honor, so as I mentioned before -- thank you. We're not -- to the extent that what everyone's representing here today is true, then we're not disputing where the garnishment funds should go. We're just seeking documentation or briefing -- you know, sort of tying everything together so that we can actually, you know, see what is actually the case or not. Right now we're just kind of making verbal representations.

And we also -- and we don't have, you know, all the documents. Like, for example, we still don't have the amortization tables. I know that only makes up a small portion if it, but that's something that, you know, we were seeking.

And so to the extent that, you know, we're -- a ruling is going to be made on the Motions to Dissolve, we would again just request a short amount of time to sort of innerduct on our own the documents to kind of figure out okay, what is it actually owed.

THE COURT: All right. Let me ask you this. In light of what Ms. McDaniel just confirmed, which was the assumption we had -- or at least I had -- in our conversation and she says you have that unredacted billing statement. Why isn't that enough to show me that the amount that's owed irrespective of sub loans, irrespective of amortization tables, that the amount that is owed on the line of credit to Cogent Bank secured by the accounts receivable is greater than the amount that is owed to Aery by Cleveland Clinic?

In other words, your premise, as I understand it, seems to be is I need these additional documents to confirm that the amount that Cogent Bank is entitled to is greater than the amount that Cleveland Clinic is going to pay. And it seems to me that the information I currently have conclusively establishes that. And so these other documents, there's nothing about them that's going to change that. I mean, why is that not where we are?

MR. PONS: I don't believe that's attached to the Motion to Dissolve and to the extent it is -- I mean, I'm not sure exactly what document is being referred to.

THE COURT: I'm referring to document --

MR. PONS: If you could provide a case number.

THE COURT: -- document 68-2. And it's the combined billing summary from Cogent Bank to Aery from March of 2025 that shows the principal balance on the operating line of credit being $11.1 million and it shows a principal balance of two separate -- what's been represented to be sub notes, being 425,000 and 3.75 million.

And the representation that was made to me by Ms. McDaniel is that that document was produced to you in an unredacted form and it provides the information that you need to show that the blocked -- excuse me, the operating account line of credit far exceeds the 925,000. So, in other words, when that 925,000 comes in, not a penny of it is going to be bumped back into Aery's unspoken for operating account. That seemed to be the premise of your motion. I need to -- I need to be sure because money that comes in might not all go to pay down the loan. Some of it may get bumped --

MR. PONS: Right.

THE COURT: -- back out to Aery and that just seems to be demonstrably shown to not be the case.

MR. PONS: So this is a statement for March of 2025. To the extent, you know -- obviously we're talking about to the present. We would ask for the statements for April of 2025 and May of 2025 to know actually what is currently owned.

MS. MCDANIEL: Except the --

MS. KELLER: And, Your Honor, just to verify --

THE COURT: Hold on. Hold on. One at a time. Ms. Keller, as I understand, that's something you have produced?

MS. KELLER: This is something we produced. We only produced up through the date of our last production. So if there's a statement that's not, you know -- that's this month, I'll certainly -- we can certainly provide that but that -- I just wanted to clarify that I, Ms. Keller, was the one who indicated that we had produced those, not Ms. McDaniel. I don't know -- I didn't announce myself and I apologize.

THE COURT: Okay, I'm sorry. Go ahead. Somebody else was trying to speak as well.

MS. MCDANIEL: The only other thing I would add to that, Your Honor -- this is Erin McDaniel on behalf of Aery -- is that the -- we produced -- we attached that as an exhibit to our Motion to Dissolve because of the date on the writ. So the writ was for the end of March of 2025 and so what was owed at the time of the writ is what determines whether or not -- that money was being held at that time, right. So that's the reason that it was produced.

And again, I don't think I can -- I can certainly represent to you that Aery has not had an influx of $11 million since the last month and a half. But I don't think that has any bearing necessarily on whether or not the money that was

withheld at that time was under our first (unintelligible).

MR. PONS: Your Honor, if I may, we don't know -- as mentioned earlier, we don't know what happened with the funds in the blocked account while we had this one writ of garnishment served on Cleveland Clinic. So we don't know what's actually owed until we can actually see those statements. So we either need the bank statements for purposes of the Motion to Dissolve which, you know, it's been -- you know, to be over that or the actual -- or this particular statement itself.

MS. KELLER: We have these -- this is Ms. Keller. We have these particular statements that we're willing to provide. What the blocked account statements, they're not going to show -- I mean, that's going to show the money in the blocked account which really isn't relevant. You know, that's going to show the funds coming into the blocked account, but not what's owed on the loan.

THE COURT: Okay. All right. I've heard enough to know what I want to do. The bottom line here is that the -- between the business loan agreement, the revolving line of credit, promissory note, and the blocked account agreement and the security interest, all of that establishes to my satisfaction that the account receivable that we're talking about owed by Cleveland Clinic is spoken for and has been spoken for by Cogent Bank through all of its perfected interest, and so that money is not available to be garnished.

And so the writ of garnishment directed to that money will be dissolved and that money can go where it would in the ordinary course of business, which would be to the blocked account to be done with as it would be in the ordinary course of business, pay down the amounts owed on the line of credit, which far exceeds that amount, so none of that money would go back into Aery's hands, and so it's where it needs to be.

And so I don't think -- I mean -- so obviously I've denied your motion for extension of time just because you haven't persuaded me that any of the documents that you don't believe you were -- that you haven't received or say you haven't received in response to your subpoenas would change those facts.

That said, I do think there might be some information that you have requested that you -- that could help you determine if there are other sources of money, where the money's coming from that they're using to pay, for example, the interest payment that we've been talking about on that account statement, maybe they haven't paid that one, but they paid ones previously, you could find out what account they're using to do that.

Additionally there's a $22,000, or 500 or $37,000, depending upon how it's calculated, annual fee that's charged on this line of credit, .25 percent of the line of credit. I think you're entitled to figure out where they're getting the money to pay that.

And so to the extent your Motion to Compel deals with

that, I would think you could -- you should get it. And I'm going to give you kind of some ideas of rulings here and then ultimately I'm going to send this Motion to Compel to a magistrate judge if you all can't sort it out.

As to the statements of the revolving -- or excuse me, the statements from the blocked account, I'm struggling to understand how that will help answer any questions. I guess the marginal relevance I see is that if there's -- if those accounts show that these accounts receivable are coming in and contrary to the representations we've heard today, they're simply being used to pay down the line of credit and instead they're being funneled into this 954-dollar account or what's supposed to be out there is a half-a-million-dollar account. I think that would be potentially relevant.

So I do see some potential relevance to the information in that blocked account beyond, it appears, what you've gotten already. And so to the extent your Motion to Compel is seeking that kind of information or information relating to where money is coming from Aery to Cogent Bank to pay these various fees and interests, I think you're probably entitled to that.

Beyond that, if that doesn't answer --

MR. PONS: That's what we're seeking, Your Honor.

THE COURT: If that didn't answer all of the questions in the Motion to Compel, then that -- I'll send that down to the

magistrate judge and you can spend some time with him explaining that. But if that answers the Motion to Compel, I will ask somebody to memorialize that if there's confusion or disagreement about it rather than me having to try to write an order telling you to do what I've just told you to do.

So Mr. --

MR. PONS: So just --

THE COURT: -- Pons, do you understand the ruling, one of them against you and one of them seemingly for you?

MR. PONS: So just to understand the last part of what you said, Your Honor -- and thank you for explaining them.

We -- generally speaking, you would find that or you see that we do have entitlement to the statements pertaining to -- the bank statements pertaining to the blocked account. Because the reason we're seeking that is because -- obviously for the reasons you stated and obviously the identity of Aery's contractors that are sending -- they're -- they're actively paying them or contracting with them. So not only they were actively -- like their identities be important but, you know, potentially any information they have and any other leads that they have for us to be able to collect on our judgment.

THE COURT: Well, help me understand that because from my perspective the most important thing for you to be able to see is money coming in and where the money's going out to. Whether it's going out to some internal Cogent account that's a

debit on the loan or whether it's going into Aery's pockets or its principals pockets. That kind of information.

I'm a little more concerned about the idea that you start sending these same type of letters to every single customer when it -- I'm fairly convinced that the money that those customers are paying, particularly the way you'd see it, if they are in the blocked account, that money is spoken for. So why would you be entitled to go harass them about money that they're paying into the blocked account?

So, I mean, the identity of who's -- where the money's coming from is less important I think, from my perspective, than that money is coming in and where it's going.

So help me understand what I'm missing there.

MR. PONS: I mean, so -- the money's not definitely spoken for and that's -- and that's sort of the issue here. And so like we would like to -- you know, since as you mentioned earlier, Your Honor, we're very proactively trying to collect on our judgment. We'd like to know who they are and, you know, we are entitled, generally speaking, like wide latitude to get that kind of discovery.

And so as far as the concern is the judgment debtor, I mean, this is really -- it's only spoken for for a certain period of time. I mean, I don't -- we don't know the full universe of income that's being received so I can't see how long and for when. And that's part of reason why we want those

statements. But we're just trying to be made whole. We want these identities to be able to know, okay, like what -- what's the foreseeable future going to look like and when are we going to get paid and how can we collect on this. So that's -- that's the second piece --

MS. KELLER: Your Honor --

MR. PONS: -- I would like to make, Your Honor.

MS. KELLER: -- I would like to respond when Mr. Pons is done. I didn't mean to interrupt. I thought he had finished.

THE COURT: All right, Ms. McDaniel.

MR. PONS: I had finished my argument there.

THE COURT: All right. Ms. McDaniel, go ahead.

MS. KELLER: This is Ms. Keller.

THE COURT: Oh, I'm sorry, Ms. Keller. Go ahead.

MS. KELLER: Yeah. So, Your Honor, the concern that you've raised is precisely the concern that Cogent has if it's going to be forced to produce the statements for the blocked account. Talentscale has filed three different garnishment actions in the State of Florida. One in the Northern District, one in the Middle District and one in the Southern District. It has issued dozens of writs of garnishment out of those accounts.

And if we produced those blocked account statements and -- and all of those funds coming into the blocked account are subject to Cogent's first priority security interest. But

if we produce those blocked account statements and Talentscale starts garnishing all of these creditors -- I'm sorry, all of these companies that are -- that are paying these receivables, Cogent is going to be unfairly harmed because it's going to have to defend all of those if it knows about them. There's a good chance that Cogent may never even know about them because the actions are being filed without Cogent's knowledge. And the writs of garnishment are being issued without Cogent's knowledge.

I just so happen to run across one in the Southern District and now I have to monitor that case in case if there's a writ of garnishment that's going to be issued. We're not a party to that case. We're not -- we haven't been served in that case with a writ of garnishment or anything.

So if we have to do this all over the United States, number one, it's going to be impossible; and, number two, it's going to subject Cogent to a very unfair burden and expense. And that's what I fear is going to happen when we produce those account statements.

To the Court's concern about determining where the money is going, Cogent did produce all of the account statements relating to all of the other accounts held by Aery with Cogent. It produced the account statements related to the operating account. It produced account statements relating to a payroll account that Aery has. And it's produced account statements

relating to another account that was closed last December.

So it has produced the account statements and counsel can see that there have not been deposits into those accounts from the line of -- or I'm sorry, from the blocked accounts, and the statements that were produced clearly show that.

Cogent has also --

THE COURT: Let me ask you this.

MS. KELLER: I --

THE COURT: Let me ask you something. What I'm anticipating or what I think would be relevant information is if -- there's got to be some account document, whether it's a ledger or something, that shows money coming into that account -- and put aside the source of it for the time being -- money coming into that account, and that money -- there's something done with that money. And I think that's the information that I see potential relevance to.

If what is done with that money is simply every day, as the loan agreement seems to talk about, there's a sweep that's done every day and a debit entry occurs in their loan balance account or line of credit account, then that's what they would see. But if it turns out that that money's coming in and every day there's two things that happen, one, a ledger entry is made that draws -- addresses a portion of the line of credit and then there is another entry that goes into the pocket of Mr. Beale, I think that would be relevant information.

I'm not saying that did happen but don't they have a right to confirm that the money that is going into that account that they otherwise could garnish is being used for what the loan documents say it's supposed to be used for, which is the blocked account is to pay down the amount that they've borrowed from you?

MS. KELLER: Yes, and we did produce a ledger yesterday. And I know that -- and this was something that I didn't consider as being encompassed by the subpoena which is why it wasn't produced earlier. But I did produce a ledger yesterday and -- or I sent it to counsel yesterday. We're going to be producing it today with Bates Numbers and everything, but that shows the flow of funds. If that doesn't -- I don't know if counsel has had a chance to even review that yet because I sent it to him last night.

If that is not sufficient, one thing that I might suggest is we -- how about we produce the blocked account statements that redact the names of the -- those companies who are depositing the funds in there.

MR. PONS: So, Your Honor, as long as we can agree that only the contractors that are sending receivables are redacted, we would be amenable to those statements being produced in that form for the time being.

THE COURT: Well, I guess Cogent's concern, which seems to be legitimate, is wherever that's coming from, whether

it's a contractor, whether it's -- I mean, I assume that's primarily where accounts receivables are coming from. But I guess I could conceive of a situation where they've done something, they're entitled to money for it, that money is spoken for through all these documents, and so wherever that's coming from, the concern is if all of those people keep getting hit with writs of garnishment and a court has to adjudicate all that money's being held, in the meantime they're not able to draw down that balance that they're owed, and I do share some of that concern.

So here's what we're going to do. It sounds like there's been some additional production that have been made that may address at least my concern. What I'm going to do at this point because I've resolved the -- the Motions to Dissolve, I'm going to require the parties to confer about the Motion to Compel with the guidance that I've provided today and file a report within -- and y'all can tell me the time frame -- within an X time frame to let me know whether you've been able to resolve it or whether there is a crystallized dispute.

And at that point I'll determine whether I want to fool with that or whether I want to let the magistrate judge deal with that. And I think I've provided enough guidance about what I think they're definitely entitled to and what I'm concerned about them getting ahold of.

And so with that guidance, my hope is that after

Mr. Pons looks at what he has, evaluates that, y'all have some conversations about what he doesn't have and thinks he still wants, and if you can't reach an agreement on that, we will then have a crystallized dispute that I can resolve better than I'm doing now with more briefing to explain more precisely what the concern is about the information y'all can't agree on.

Does that sound reasonable, Mr. Pons?

MR. PONS: Your Honor, I have actually the document in front of me and it's somewhat helpful, but there's terminology here that's just like very vague, it doesn't show where the money's moving from.

THE COURT: Okay. Well, that's --

MR. PONS: That's the concern that we have, yeah.

THE COURT: All right. Well, that's --

MR. PONS: It doesn't show, for example, it would go to a Scott Beale or whatever principal, you know.

THE COURT: Well, that's -- that's part of the guidance --

MR. PONS: -- (unintelligible) -- okay.

THE COURT: That's part of guidance for y'all to try to resolve that.

Ms. Keller, do you understand what I'm asking and expecting?

MS. KELLER: Yes, I do, Your Honor.

THE COURT: All right.

MS. KELLER: Yes.

THE COURT: What time frame do y'all want to have that conversation and try to come to resolution on that Motion to Compel, from your perspective, Ms. Keller?

MR. PONS: 14.

THE COURT: I'm sorry, 14 days is Mr. Pon's suggestion. Ms. Keller, is that suitable?

MS. KELLER: That's fine, yes.

THE COURT: All right.

One other question and I think, Ms. Keller, you've kind of raised this indirectly, but one question I've had is why is this case here? As I understand, Cogent Bank is not here. Cleveland Clinic is not here. And when I say here, I mean in the Northern District of Florida. I don't think there's a jurisdictional issue because everybody has sought affirmative relief, so any jurisdictional concerns that they had they've waived.

But I'm just wondering as a practical matter, why is this garnishment action, all this going on in the Northern District of Florida, Mr. Pons?

MR. PONS: So the reason that we're doing that, Your Honor, is there's multi -- the Court has jurisdiction over multiple entities and parties that we've subpoenaed. And so it's just as a practical matter we've issued them through this court.

THE COURT: Are there also -- and I guess I saw in some document I looked at before today that there's a pending proceeding in the Middle District of Florida that garnishment action is -- or at least post-judgment discovery is going on with respect to Cogent Bank. Is that accurate?

MR. PONS: Yes. We -- since -- since Cogent Bank basically entertained it didn't have any -- little to no assets in the account that it reported, we didn't proceed with that action.

THE COURT: And so that's essentially the same thing that we've been talking about just now, right?

MR. PONS: Correct, Your Honor.

THE COURT: And so why was that down in the Middle District? Is that where Cogent is located?

MS. KELLER: Yes, Your Honor.

MR. PONS: Initially -- yes, so initially we filed here and then Cogent disputed jurisdiction so then we filed over there.

THE COURT: Okay. Okay. And from Ms. Keller, is -- at this point I guess you may not be happy you're here, but you're here, right?

MS. KELLER: Yeah. I think, Your Honor, when we answered the writ of garnishment -- Cogent has been served with writs of garnishment in this action, also up in the Eastern District of Virginia, and at some point they just want to be

done, you know. And the Middle District case was actually filed after this case.

And there were several attempts for -- Talentscale moved for issuance of several writs of garnishment. The Court there *sua sponte* denied those motions for lack of jurisdiction. So I think, you know, that's part of the reason why all of the writs are being sought out of this district. There are some, like I said, out of the Southern District as well that we've been monitoring, and gosh knows where else around the United States. I hope that's it but...

MR. PONS: Your Honor, if I may -- I don't want to -- it seems like everybody's painting themselves as a victim here. We have a debt. We have a judgment that was entered by a federal court. We're entitled to collect on this judgment. And the reason that those were dismissed because the Court saw that the registered -- which is the only permission they could have used, they saw the registered agent wasn't within that district and so they just *sua sponte* did deny those. But there was no discovery conducted on that.

THE COURT: And I am very sympathetic --

MR. PONS: So a separate issue.

THE COURT: I am very sympathetic to the fact that you have a debt that you're entitled to recover, and I've made very clear that I think that y'all can figure out a way to get that done. I haven't paid maybe as close of attention as the judge

in the Middle District did in evaluating whether I have the authority to issue these writs of garnishment as many as were issued. I have typically, you know, looked at them, you've asked for them and I figure that if somebody responding to them wants to tell me I don't have jurisdiction then we'll have that debate.

But I guess just moving forward, I don't want to be issuing writs of garnishment to folks that I don't have some sort of jurisdiction over. And so I would just urge you to be more circumspect in evaluating whether I'm the proper court to be issuing these writs, and don't want you to assume moving forward that simply because I have as a matter of course without doing the due diligence that I guess that district judge in the Middle District did, that that will be how we proceed.

But for the folks that are here today, they're all here, and I think have not challenged my jurisdiction to do whatever I'm doing, and so we'll proceed ahead in that regard. But I just -- I don't want to become the collection agent court for Talentscale, as sympathetic as I am to the fact that you ought to be able to collect this money from a company that appears to be a going concern and at least may be teetering on the edge of bankruptcy but haven't gotten into it yet.

So with that, any final comments, Mr. Pons?

MR. PONS: None, Your Honor. Thank you so much for your time.

THE COURT: All right. Mr. Daniels --

A MALE VOICE: Your Honor.

THE COURT: Hold on, I'm going around the room.

MS. MCDANIEL: No, Your Honor. Thank you.

THE COURT: Ms. Rodriguez, anything you want to add?

MS. RODRIGUEZ: No, Your Honor. Thank you.

THE COURT: Ms. Keller, anything you want to add?

MS. KELLER: No, Your Honor. Thank you for your time.

THE COURT: All right. Mr. Gross, you happy you've been here?

THE WITNESS: Yes, Your Honor, it's an education. Thank you.

THE COURT: All right.

And, Mr. Quam, anything you want to add?

MR. QUAM: Yes, I just want to clarify, Your Honor, that the Court is going to be dissolving the writ against Cleveland Clinic.

THE COURT: Yes, I'm going to get an order entered after today that does a couple of things. It grants the various Motions to Dissolve the Writ, it denies the Motion for Extension of Time, and it defers ruling on the Motion to Compel with the direction that the parties report back in 14 days.

From your perspective, Mr. Quam, do I need to do anything more than say the writ of garnishment is dissolved? Do you need to be told where to send the money or does the

dissolution of the writ allow you to just act in the normal course of business now?

MR. QUAM: So, yes, the dissolution then will just release the hold on the funds that we've been holding since the writ was issued.

THE COURT: All right. Very well.

All right. Well, thank you all for your time and I'll get that order out as quickly as I can today. And in the event that y'all aren't able to resolve any lingering issues with respect to the discovery production, I'll see the report and I'll at that point decide whether I want to address it directly or whether consistent with my standard practice and what I've been doing in this case, referring discovery disputes down to the magistrate judge.

So either we'll be together again or you'll get to talk to the magistrate judge.

So with that I hope everyone has a nice afternoon, a nice long weekend and we are adjourned.

*(Proceedings adjourned at 11:13 a.m.)*

* * * * * * * *

I hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, pursuant to the provisions of Section 753, Title 28, United States Code.

Jul June 4, 2025

Julie A. Wycoff, RMR, CRR Date
Official U.S. Court Reporter

# EXHIBIT 5

dotloop signature verification: dtlp.us/NFf2-XkRL-I9Ol4Y

NABOR
Naples Area Board of REALTORS®

# SALES CONTRACT (RESIDENTIAL VACANT LAND)

EQUAL HOUSING OPPORTUNITY

**SELLER:** Ryan Vander Heiden **BUYER:** Scott Beale

**SELLER:** Dawn Vander Heiden **BUYER:** ______

**ADDRESS:** ______ **ADDRESS:** 8211 Lakeshore
Mentor, Ohio 44060

UPON ACCEPTANCE OF THE OFFER OR COUNTEROFFER, SELLER has agreed to sell and BUYER has agreed to buy, UPON THE FOLLOWING TERMS AND CONDITIONS, the real property legally described as ("Property"): MARCO BCH UNIT 3 BLK 94 LOT 10 OR 1359 PG 2342 Collier County, Florida. If applicable, SELLER shall convey SELLER's exclusive right to use any common elements and common areas to which SELLER has an exclusive right of use and the right to convey.
The address of the Property is: 127 Gulfport Ct, Marco Island, FL 34145

**1. PURCHASE PRICE**: The purchase price (U.S. currency) shall be payable as follows: ------------------------$ ~~1,100,000.00~~ $1,250,000.00 RV DV SB 02/06/22 3:12 PM EST dotloop verified

**A.** Initial Deposit to be held in escrow ----------------------------------------$ 10,000.00

**[SELECT ONE. IF NO SELECTION IS MADE, ACCOMPANIES OFFER SHALL APPLY.]**

☐ accompanies offer ☐ is due on the Effective Date ☑ is due not later than 5 days after Effective Date.

**B.** Additional Deposit to be received in escrow not later than 17 days after the Effective Date, in the amount of ----------------------------------------$ ~~90,000.00~~ $115,000.00 RV DV SB 02/06/22 3:12 PM EST dotloop verified

**C.** Proceeds of mortgage, if any [See Paragraph 4.B.] ------------------------$ ______

**D.** Proceeds of SELLER mortgage, if any [see Paragraph 4.C.] ------------------------$ ______

**E.** Other: ______ $ ______

**F.** Balance of the purchase price, payable from BUYER to closing agent at closing, subject to adjustments and prorations, of approximately ------------------------$ ~~1,000,000.00~~ $1,125,000.00 RV DV SB 02/06/22 3:12 PM EST dotloop verified

Closing funds and all deposit funds tendered to the closing agent within 15 days prior to closing shall be paid by wire transfer. All international funds shall be paid by wire transfer. All deposits are subject to collection.

**2. PERIOD OF OFFER AND COUNTEROFFER; EFFECTIVE DATE**: This offer is revoked if not accepted, and the signed offer delivered to offeror, by 3:00 ☐ AM ☑ PM on 02/08/2022 {Insert Date}. Any counteroffer is revoked if not accepted and the signed counteroffer delivered to counterofferor not later than ______ days [2 days if left blank] after delivery of the counteroffer. The Effective Date of this Contract shall be the last date either SELLER or BUYER signs or initials this Contract. ALL CHANGES TO THE OFFER OR COUNTEROFFER MUST BE INITIALED AND DATED. THE LATEST DATE SET FORTH ON THIS CONTRACT BY EITHER PARTY'S SIGNATURE OR INITIALS SHALL BE THE EFFECTIVE DATE.

**3. CLOSING DATE; TIME OF THE ESSENCE; CLOSING LOCATION; CLOSING AGENT; POSSESSION**: Closing shall occur on 03/23/2022 {Insert Date}, (the "Closing Date"). **Time is of the essence as to the Closing Date.** Closing shall occur in the county where the Property is located, at an office designated by the closing agent, who shall be selected by BUYER. BUYER shall be the legal owner of the Property as of the closing, and SELLER shall vacate and give possession of the Property at the closing. SELLER shall leave the entire Property free of debris.

**4. METHOD OF PAYMENT [SELECT ONE. IF NO SELECTION IS MADE, A. SHALL APPLY]**: ☑ **A. CASH/FINANCING WITHOUT CONTINGENCY**: BUYER will pay cash, but may obtain a loan for the purchase of the Property; however, there is no financing contingency. **If BUYER elects to finance BUYER's purchase of the Property through a creditor/lender, BUYER shall be required to timely perform all BUYER's obligations under the Contract and to close on the Closing Date, notwithstanding any terms and conditions imposed by BUYER's**



Electronically Signed using eSignOnline™ [ Session ID : f1f7d344-70a0-47da-a67b-509b57e0354b ]

dotloop signature verification: dtlp.us/NFf2-XkRL-I9Ol!4Y

**creditor/lender and/or any applicable disclosure, delivery and compliance requirements of the Consumer Financial Protection Bureau Integrated Mortgage Disclosure Rule ("CFPB Rule");** ☐ **B. FINANCING CONTINGENCY**: Subject to the provisions of this paragraph, BUYER's obligation to purchase the Property is contingent upon BUYER obtaining a loan, unless waived by BUYER as set forth below, in the amount shown in 1.C. above, to be secured by a mortgage on the Property at **[IF NO SELECTIONS ARE MADE, (1) SHALL APPLY]**: ☐ (1) Conventional ☐ (2) VA ☐ (3) FHA ☐ (4) Other__________________________________. **[If VA OR FHA, The "Addendum to Sales Contract VA/FHA Financing" should be attached hereto and made a part hereof], at** ☐ (1) an initial or ☐ (2) fixed rate of interest not exceeding _______ % per year, for an amortized term of _______ years [30 years if left blank]. BUYER shall make loan application as defined in the CFPB Rule ("Loan Application") not later than _______ days after the Effective Date [5 days if left blank], and shall make a continuing good faith and diligent effort to obtain said loan and comply with all applicable requirements of the creditor/lender and CFPB Rule relating to the loan process. If BUYER fails to waive this financing contingency on or before ______________________________ {Insert Date} [45 days after the Effective Date if left blank], either SELLER or BUYER may terminate this Contract at any time. BUYER's termination under this contingency must be accompanied by either (i) an Equal Credit Opportunity Act statement of adverse credit action issued by a creditor/lender confirming that mortgage financing on the terms set forth in this Contract was denied on grounds that either the Property was unacceptable to the creditor/lender or the BUYER financially failed to qualify for said financing terms, or (ii) other evidence from the creditor/lender that BUYER has made Loan Application and made diligent and good faith efforts to meet all applicable requirements of the creditor/lender and the CFPB Rule, but has received neither loan approval nor loan denial from the creditor/lender. SELLER's right to terminate shall cease to exist if BUYER waives this financing contingency prior to SELLER giving BUYER notice of termination. **IF BUYER WAIVES THIS CONTINGENCY AND IS UNABLE TO CLOSE ON THE CLOSING DATE DUE TO A DELAY CAUSED SOLELY BY THE CREDITOR/LENDER AND/OR NECESSITATED BY THE CFPB RULE, BUYER MAY EXTEND THE CLOSING DATE UP TO 10 DAYS FOR CFPB RULE COMPLIANCE AND TO ACCOMMODATE RECEIPT AND EXECUTION OF THE LOAN PACKAGE AND LOAN FUNDING. Delivery of documentation evidencing loan commitment or loan approval shall not constitute a waiver of the financing contingency. BUYER acknowledges that once BUYER waives this financing contingency, BUYER's deposit monies are no longer refundable under this Paragraph 4.** ☐ **C. SELLER FINANCING**. The "Addendum to Sales Contract Seller Financing" is attached hereto and made a part hereof.

**5. CDD/MSTU SPECIAL TAX DISTRICTS**: The Property ☐ is ☑ is not located within a Community Development District (CDD) or Municipal Service or Benefit Taxing Unit (MSTU). BUYER will at closing assume any outstanding capital assessment balance. **If the Property is located within a CDD or MSTU, and if there is any outstanding capital balance, BUYER should not execute this Contract until BUYER has received and signed the "CDD/MSTU Assessments Disclosure" or similar written disclosure from SELLER setting forth the approximate outstanding capital assessment balance, which BUYER will assume at closing.**

**6. CONDOMINIUM/HOMEOWNERS' ASSOCIATION AND GOVERNMENTALLY IMPOSED LIENS AND SPECIAL ASSESSMENTS**. SELLER shall pay the full amount of condominium/homeowners' association special assessments and governmentally imposed liens or special assessments (other than CDD/MSTU assessments which are addressed in Paragraph 5), which, on or before the Effective Date, are a lien or a special assessment that is certain as to (a) the identity of the lienor or assessor, and (b) the property subject to the lien or special assessment, and (c) the amount of the lien or special assessment. If, as of the Effective Date, there are any pending liens or special assessments (liens or special assessments other than those described above) which are not SELLER's obligation as set forth above and which were not disclosed in writing to BUYER by SELLER prior to or concurrent with the execution of this Contract, and which exceed 1% of the purchase price, BUYER may terminate this Contract, unless SELLER agrees in writing to pay the portion of such pending liens or special assessments in excess of 1% of the purchase price, and SELLER agrees to pay into escrow at closing a reasonable sum to insure that the excess will be paid.

**7. EXISTING LEASES WITH POST-CLOSING OCCUPANCY**. ☐ If this box is checked, the Property is subject to one or more leases and/or rental agreements (collectively "Leases") in effect as of the Effective Date with occupancy occurring after the closing. SELLER shall deliver complete information regarding the terms of said Leases and copies of all written Leases (collectively the Lease Information") to BUYER not later than 5 days after the Effective Date. BUYER shall have 5 days after receipt of the Lease Information to review the same, and may terminate this Contract not later than 5 days after receipt of the Lease Information, if in BUYER's sole discretion the Lease Information is unacceptable. If SELLER fails to timely deliver the Lease Information, BUYER may terminate this Contract not later than 10 days after the Effective Date.

**8. DUE DILIGENCE; WAIVER**: **[SELECT ONE. IF NO SELECTION IS MADE, A. SHALL APPLY]**: ☑ **A. DUE DILIGENCE**: BUYER reserves the right to conduct the Inspections provided for in Standard D.2. of this Contract, not later than ~~15~~ 10 days after the Effective Date [60 days if left blank] (the "Due Diligence Period") to determine whether the Property is suitable, in BUYER's sole discretion, for BUYER's intended use;

SB 02/06/22 3:12 PM EST dotloop verified    RV    DV

Electronically Signed using eSignOnline™ [ Session ID : f1f7d344-70a0-47da-a67b-509b57e0354b ]

dotloop signature verification: dtlp.us/NFf2-XkRL-I9Ol!4Y

or ☐ **B. WAIVER OF DUE DILIGENCE**: BUYER has visually inspected the Property and determined that same is suitable for BUYER's intended use, in its current "as is" condition as of the Effective Date, including the conditions disclosed in Standard D.1.a. or in Other Terms and Conditions. BUYER's obligation to purchase the Property is not contingent upon any inspections, tests or studies.

# REAL ESTATE TRANSACTION STANDARDS

**THE REAL ESTATE TRANSACTION STANDARDS SHOULD NOT BE REVISED OR MODIFIED EXCEPT IN OTHER TERMS AND CONDITIONS AND/OR BY ADDENDUM/ADDENDA.**

**STANDARD A—TITLE; TITLING INSTRUCTIONS; ASSIGNMENT; TAX DEFERRED EXCHANGE.**

**1. MARKETABLE TITLE:** Title to the Property shall be good and marketable according to the Uniform Title Standards promulgated by the Florida Bar, and have legal access, subject only to the following exceptions: (a) ad valorem and non-ad valorem real property taxes for the year of closing and subsequent years; (b) zoning, building code and other use restrictions imposed by governmental authority; (c) outstanding oil, gas and mineral interests of record, if any; and (d) restrictions, reservations and easements common to the subdivision (or condominium, if applicable), provided that none of the foregoing shall prevent use of the Property for residential purposes.

**2. TITLING INSTRUCTIONS FROM BUYER; ASSIGNMENT:** Not later than 15 days prior to the Closing Date, BUYER shall deliver to SELLER the name(s), address, manner in which title will be taken, and a copy of any assignment executed by BUYER. No assignment shall release BUYER from the obligations of this Contract unless SELLER consents in writing to such release.

**3. TAX DEFERRED EXCHANGE:** If either party intends to treat this transaction as a tax-deferred exchange under I.R.C. Section 1031, the other party shall cooperate in accomplishing the exchange, and consents to the assignment of this Contract to a qualified exchange intermediary for that purpose, provided there is no additional cost or delay in closing and the exchanger is not released from liability under this Contract.

**STANDARD B—TITLE EVIDENCE; EXAMINATION; DEFECTS; LEGAL ACCESS; CLEARANCE.** Not later than 10 days after the Effective Date, SELLER shall furnish to BUYER a complete copy of SELLER's owner's title insurance policy. If the Property is located in Collier County and SELLER fails to furnish a copy of the policy within the above time period, SELLER shall give BUYER a $150.00 credit at closing in lieu thereof. BUYER shall have 30 days after the Effective Date ("Examination Period") for examination of title and determination of legal access. BUYER's obligation to purchase is conditioned on the Property having legal access to and from a public right of way sufficient for residential use. If title is found defective or legal access is found to be lacking, BUYER shall, within the Examination Period, notify SELLER specifying the title defect(s) or lack of legal access, and furnish copies of the title evidence and instruments evidencing such title defect(s) or lack of legal access. If the title defect(s) render(s) title unmarketable, or if SELLER cannot deliver possession, or if there is no legal access, SELLER shall have 30 days after receipt of said notice and copies from BUYER (the "Clearance Period") to clear or remove such title defect(s), deliver possession, and/or provide legal access, at SELLER's expense. SELLER will use diligent effort to correct the title defect(s), deliver possession, and/or provide legal access within the Clearance Period, including the bringing of necessary suits. If the Closing Date is prior to the expiration of the Clearance Period, then the Closing Date shall be extended until the earlier of (i) 5 days after SELLER corrects the title defect(s), delivers possession, and/or provides legal access or (ii) 5 days after the expiration of the Clearance Period. SELLER shall not be liable to BUYER for damages if SELLER cannot render title marketable, deliver possession and/or provide legal access. If SELLER does not clear or remove the title defect(s), deliver possession or provide legal access within the Clearance Period, BUYER may elect either to accept such title, possession, and/or access as SELLER can provide or to terminate this Contract by giving SELLER notice of such election not later than 5 days after expiration of the Clearance Period. If BUYER makes no such election, BUYER shall be deemed to have accepted such title, possession and access as SELLER can provide and close within the later of (i) 10 days after expiration of the Clearance Period or (ii) the Closing Date. A monetary lien upon the Property shall not constitute a title defect if said lien can be paid and satisfied from SELLER's proceeds at closing.

**STANDARD C—SURVEY; COASTAL CONSTRUCTION CONTROL LINE.**

**1. SURVEY AND SURVEY OBJECTIONS:** Unless the Property is a condominium or cooperative unit, SELLER shall furnish to BUYER, not later than 10 days after the Effective Date, a complete copy of any survey of the Property in SELLER's possession and which has been certified to SELLER (together with flood elevation certificate, if applicable). If to SELLER's knowledge there are no improvements or encroachments currently located upon the Property other than as shown on the SELLER's survey, SELLER shall execute an affidavit of "no change" affirming same to BUYER. BUYER may, at BUYER's expense, have the Property surveyed not later than 5 days prior to the Closing Date ("Survey Period"). If the survey, as certified by a registered Florida surveyor, correctly shows: (a) an encroachment onto the Property; or (b) that an improvement located on the Property projects onto lands of others; or (c) lack of legal access (collectively "Survey Objections"), BUYER may, within the Survey Period, notify SELLER of the Survey Objections and shall furnish a copy of the survey. The Survey Objections shall be treated

Electronically Signed using eSignOnline™ [ Session ID : f1f7d344-70a0-47da-a67b-509b57e0354b ]

dotloop signature verification: dtlp.us/NFf2-XkRL-I9OI!4Y

as a title defect(s). If BUYER fails to obtain a survey within the Survey Period, BUYER waives any right to object to any matters which might have been shown on a survey. If BUYER fails to make any Survey Objections within the Survey Period, BUYER waives any Survey Objections.

**2. COASTAL CONSTRUCTION CONTROL LINE:** (a) If any portion of the Property lies seaward of the Coastal Construction Control Line, Florida law requires the following disclosure: The property being purchased may be subject to coastal erosion and to federal, state or local regulations that govern coastal property, including the delineation of the coastal construction control line, rigid coastal protection structures, beach nourishment, and the protection of marine turtles. Additional information can be obtained from the Florida Department of Environmental Protection, including whether there are significant erosion conditions associated with the shoreline of the property being purchased. (b) If any portion of the Property lies seaward of the Coastal Construction Control Line, BUYER waives the right to receive a survey or affidavit from SELLER delineating said line upon the Property.

**STANDARD D—DISCLOSURES; ZONING; DUE DILIGENCE AND INSPECTIONS; MAINTENANCE OF PROPERTY; ADVISEMENTS AND ACKNOWLEDGMENTS; EXTREME WEATHER CONDITION.**

**1. DISCLOSURES:**

**a. GENERAL:** SELLER knows of no facts or conditions materially affecting the value of the Property, except those which are readily observable by BUYER, or which have been disclosed to and acknowledged by BUYER prior to BUYER's execution of any offer (or counteroffer, as applicable).

**b. WETLANDS; SUITABILITY:** Wetlands are commonly found in Florida and may restrict or increase the cost of construction upon the Property. Except as disclosed to BUYER in the manner set forth in Standard D.1.a., SELLER does not know of any portion of the Property that has been determined to be wetlands, or of any other condition or circumstance adversely affecting the Property which might impair its suitability for residential use or construction.

**c. PROPERTY TAXES:** Florida law required disclosure: BUYER should not rely on the SELLER's current property taxes as the amount of property taxes that BUYER may be obligated to pay in the year subsequent to purchase. A change of ownership or property improvements triggers reassessments of the property that could result in higher property taxes. If you have any questions concerning valuation, contact the county property appraiser's office for information.

**d. ZONING:** SELLER has not commenced any proceedings to change the current zoning classification of the Property, nor will SELLER initiate any such proceedings. SELLER has not received notice from any third party(ies) of any proceedings which would affect the current zoning classification of the Property. Should SELLER receive any such notice, SELLER will promptly notify BUYER of same, and if the proposed zoning would prevent the current use of the Property, BUYER may terminate this Contract not later than 5 days after receipt of said notice.

**2. DUE DILIGENCE AND INSPECTIONS:** If 8 A. was selected, BUYER may, within the Due Diligence Period, determine whether the Property is suitable, in BUYER's sole discretion, for BUYER's intended use. During the Due Diligence Period, BUYER may evaluate, without limitation, the building and zoning laws and restrictions, wetlands determinations, environmental conditions and restrictions, presence of radon, soil and grade, presence of termites and other wood-destroying organisms, availability of water, sewer and other utilities, consistency with local, state and regional growth management plans, availability of permits, government approvals and licenses applicable to the Property, and to conduct, at BUYER's expense, any and all tests, reports, studies, inspections, analyses, surveys and assessments that BUYER deems necessary and appropriate to determine the suitability of the Property for BUYER's intended use (collectively the "Inspections"). BUYER and BUYER's agents, employees and contractors shall have the right to enter the Property at all reasonable times and at their own risk during the Due Diligence Period for the purpose of conducting the Inspections. BUYER will indemnify and hold SELLER harmless from and against all losses, damages, costs, claims and expenses of any nature, including attorney fees (collectively "Losses"), and from and against any liability to any person arising from, out of or in connection with the Inspections, except as to Losses resulting from negligence or intentional acts or omissions of SELLER. BUYER will not cause any construction lien(s) to be placed against the Property as a result of the Inspections. If BUYER determines for any reason that the Property is not suitable for BUYER's intended use, and notifies SELLER of same prior to expiration of the Due Diligence Period, BUYER may terminate this Contract. In that event, BUYER shall repair any and all damage to the Property resulting from or caused by the Inspections, and shall otherwise return the Property to its condition prior to the Inspections. BUYER's failure to so notify SELLER of BUYER's election to terminate this Contract shall constitute BUYER's acceptance of the Property as suitable for BUYER's intended use, in its "as is" condition. BUYER's right to terminate hereunder has been bargained for between the parties, and each party acknowledges full and adequate consideration has been received for this provision.

**3. MAINTENANCE OF PROPERTY:** SELLER shall maintain the Property (including without limitation the lawn, shrubbery, and landscaping) in the condition existing on the Effective Date until the Closing Date or date of possession, whichever is earlier, and shall not cause or permit deterioration of the Property, or otherwise take any action to diminish the value of the Property.

**4. ADVISEMENTS AND ACKNOWLEDGEMENTS:**

**a. MANDATORY/BUNDLED CLUB MEMBERSHIP:** The Property is or may be located in a community with a mandatory or bundled club membership, and BUYER may be required to pay certain initiation and other fees, dues and/or use charges imposed by the club. If BUYER has questions or requires additional information pertaining to applicable club requirements and/or fees, dues and charges, BUYER should contact said club.

Electronically Signed using eSignOnline™ [ Session ID : f1f7d344-70a0-47da-a67b-509b57e0354b ]

dotloop signature verification: dtlp.us/NFf2-XkRL-I9Ol!4Y

**b. COMMUNITY INVESTIGATION:** BUYER is advised that any condominium and/or homeowners' documents received by BUYER may not include important information about the community(ies) where the Property is located, including without limitation pending foreclosures, types and amounts of insurance coverage, current budget and reserve amounts, and status of delinquent assessments; ownership, financial and membership status of private clubs, golf course(s), marina(s), and other amenities; the status of the developer(s) if the community or any portion thereof is developer-controlled; and facts about the surrounding community(ies), school districts and public and government infrastructure plans. SELLER by signing this Contract designates BUYER as SELLER's representative for purposes of obtaining said information.

**c. SQUARE FOOTAGE:** BUYER is aware that any reference to the square footage and size of the Property is approximate and is not warranted and should be independently verified by BUYER prior to execution of this Contract.

**d. FAIR HOUSING BROCHURE**: BUYER and SELLER acknowledge receipt of the Equal Opportunity in Housing brochure provided by the National Association of Realtors advising the parties of their rights under the federal Fair Housing Act as well as other federal, state and local laws.

**5. EXTREME WEATHER CONDITION:** If, due to a pending or threatened hurricane, tropical storm, or other extreme weather condition, services essential for closing are not available, BUYER or SELLER may delay the Closing Date until a date that is not more than 5 days after services essential for closing are restored. If such services essential for closing remains unavailable for a period of 30 continuous days, then either SELLER or BUYER may terminate the Contract not later than 35 days after such extreme weather condition rendered services essential for closing unavailable.

**STANDARD E—SELLER'S INSTRUMENTS AND EXPENSES.** SELLER shall pay for and provide, when applicable: (1) the title evidence or credit specified in Standard B; (2) if the Property is located in Lee or Charlotte County, the premium for the owner's title insurance policy issued by the closing agent selected by BUYER, and the charges for title search and title continuation through the date of deed recording; (3) preparation of statutory warranty deed (or special warranty deed if SELLER is a fiduciary), condominium/homeowners' association estoppel letter(s), broker compensation verifications; tenant estoppel letter(s), copy(ies) and assignment(s) of lease(s), and an affidavit regarding liens, possession, and withholding under FIRPTA, in a form sufficient to allow "gap" coverage by title insurance; (4) mortgage payoff letter from existing creditor/lender(s); (5) documentary stamp tax on deed; (6) real estate brokerage compensation contractually agreed to by SELLER (to be disbursed by closing agent at closing); (7) any condominium/homeowners' association special assessments and governmentally imposed liens or special assessments which are SELLER's obligation under Paragraph 6; (8) SELLER's attorney fees; and (9) if SELLER is subject to withholding under FIRPTA, reasonable charges associated with withholding, escrowing and/or remitting funds, and/or preparing the withholding certificate application and/or tax return related thereto; (10) reimbursement of prepaid estoppel fees and other costs advanced on behalf of SELLER; and (11) wire fees associated with transfer(s) of SELLER proceeds and payoffs.

**STANDARD F—BUYER'S INSTRUMENTS AND EXPENSES.** BUYER shall pay for and provide, when applicable, including any sales tax due thereon: (1) recording fee for deed; (2) all costs of any institutional loan secured by BUYER; (3) the premium for creditor/lender title insurance policy, and if the Property is located in Collier County, the premium for the owner's title insurance policy issued by the closing agent selected by BUYER and the charges for title search and title continuation through the date of deed recording; (4) recording membership approval; (5) survey charges; (6) condominium/homeowners' association membership transfer fee; (7) condominium/homeowners' association resale transfer fee/capital contribution; (8) any pending homeowners'/condominium association special assessments and governmentally imposed liens or special assessments which are not the SELLER's obligation under Paragraph 6; (9) real estate brokerage compensation contractually agreed to by BUYER (to be disbursed by closing agent at closing); (10) BUYER's attorney fees; (11) BUYER shall promptly pay and indemnify and hold SELLER harmless against any claims or liens upon the Property for surveyor or other services furnished to the Property at the request of BUYER; (12) code enforcement/municipal lien search fees; 13) reimbursement of prepaid application fees and other costs advanced on behalf of BUYER; and (14) reimbursement to the closing agent of any deposit and closing funds shortages due to deduction of wire fees.

**STANDARD G—PRORATIONS; CREDITS.** These items will be prorated as of the Closing Date, with BUYER charged with and entitled to the Closing Date, or the possession date, whichever is earlier: (1) real and personal property taxes based on the current year, if available. If not available, the taxes shall be based on the TRIM "Your Taxes This Year if PROPOSED Budget is Adopted" amount and current year non-ad valorem amount(s), if available; otherwise the prior year non-ad valorem amounts. If neither the current year tax nor TRIM amounts are available, the taxes shall be based on the prior year's bill (without discount or exemptions no longer available in the year of closing). A tax proration based upon any estimated tax shall, at the request of either party, be re-prorated based on the actual tax bill amount with maximum discount; (2) interest on any assumed indebtedness; (3) rents; and (4) condominium/homeowners' association assessments and CDD/MSTU operating and maintenance assessments. BUYER shall receive from SELLER at closing a credit equivalent to the amount of any security deposit and prepaid rents held by SELLER, and any accrued interest thereon, or alternatively, ownership or an assignment of the account in which the deposits and prepaid rents, and any accrued interest thereon, are held.

**STANDARD H—HOMEOWNERS' ASSOCIATION DISCLOSURE.** If the Property is located within and governed by any mandatory homeowners' association, the following provisions are incorporated into this Contract:

Electronically Signed using eSignOnline™ [ Session ID : f1f7d344-70a0-47da-a67b-509b57e0354b ]

dotloop signature verification: dtlp.us/NFf2-XkRL-I9Ol4Y

**IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BY DELIVERING TO SELLER OR SELLER'S AGENT OR REPRESENTATIVE WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING.**

**BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE "HOMEOWNERS' ASSOCIATION DISCLOSURE SUMMARY," WHICH IS ATTACHED TO AND MADE A PART OF THIS CONTRACT.**

**STANDARD I—CONDOMINIUM RESALE DISCLOSURE; VOIDABILITY RIGHTS.** If the Property is a condominium unit(s), the following provisions are incorporated into this Contract: **THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS, EXCLUDING SATURDAYS, SUNDAYS AND LEGAL HOLIDAYS, AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER AND RECEIPT BY BUYER OF A CURRENT COPY OF THE DECLARATION OF CONDOMINIUM, ARTICLES OF INCORPORATION, BYLAWS, AND RULES OF THE ASSOCIATION, AND A COPY OF THE MOST RECENT YEAR-END FINANCIAL INFORMATION AND FREQUENTLY ASKED QUESTIONS AND ANSWERS DOCUMENT IF SO REQUESTED IN WRITING. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 3 DAYS, EXCLUDING SATURDAYS, SUNDAYS AND LEGAL HOLIDAYS, AFTER THE BUYER RECEIVES THE DECLARATION, ARTICLES OF INCORPORATION, BYLAWS, AND RULES OF THE ASSOCIATION, AND A COPY OF THE MOST RECENT YEAR-END FINANCIAL INFORMATION AND FREQUENTLY ASKED QUESTIONS AND ANSWERS DOCUMENT IF REQUESTED IN WRITING. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.** BUYER shall also be entitled to receive a copy of the Condominium Governance Form required by Florida Statutes, and the above stated right of BUYER to cancel this Contract shall apply to BUYER's receipt of said governance form in the same manner as applies to the other above-referenced condominium documents. BUYER, by its execution of this Contract, hereby requests a current copy of the above referenced condominium documents and Condominium Governance Form.

**STANDARD J—HOMEOWNERS' ASSOCIATION PROVISIONS; MEMBERSHIP APPROVAL.** Any homeowners' association reserve account(s) is included in the purchase price. If association membership approval is required, BUYER shall, not later than 10 days after the Effective Date, make application for same in the name(s) in which title will be taken, and shall comply with all governing requirements of the association and be responsible for securing membership approval. If no written approval has been obtained from the applicable homeowners' association by the Closing Date, either BUYER or SELLER may terminate this Contract by giving the other party notice of said termination prior to receipt of the approval. SELLER shall obtain a letter(s) from the association(s) which sets forth the amounts, periods and payment status of assessments and transfer fees and resale capital assessments and deliver same to the BUYER not later than 15 days prior to the Closing Date.

**STANDARD K—MORTGAGE CREDITOR/LENDER POLICIES.** If BUYER elected to obtain mortgage financing under Paragraph 4.B., the policies of the creditor/lender shall prevail as to the procedures for closing and disbursement of mortgage loan proceeds.

**STANDARD L—ESCROW; ESCROW AGENT(S).** The escrow agent who accepts in escrow the deposit(s) paid under this Contract (the "Escrow Agent") shall hold the deposit(s) within the State of Florida in escrow until the earlier of: (1) delivery to another Escrow Agent for closing, who by acceptance agrees to these terms and becomes the Escrow Agent (the Escrow Agent holding the deposit(s) is authorized to so transfer the funds and is relieved of all liability for the funds delivered); (2) delivery of the deed, with payment of the deposit(s) as part of the purchase price of the Property; (3) such time as BUYER may be entitled to return of the deposit(s); or (4) delivery pursuant to written direction of the parties, at which time the Escrow Agent shall pay all of the deposit(s) to the party(ies) entitled thereto. The Escrow Agent shall not be liable for the payment of any interest, damages, attorney fees or court costs in any action brought to recover the deposit(s) held in escrow, or any part thereof, unless the Escrow Agent shall fail or refuse to pay over any such deposit(s) pursuant to a judgment, order or decree that shall be final beyond possibility of appeal. In any proceeding which litigates the disposition of the deposit(s), the Escrow Agent shall be entitled to be paid reasonable attorney fees and court costs, which shall be paid by the non-prevailing party. The Escrow Agent has no duty to collect or attempt to collect any deposit or check given as a deposit, but shall give the parties written notice of: (a) any deposit that is not received, not later than 5 days after its due date, and (b) any deposit check that is not paid on presentation not later than 5 days of learning of its dishonor. If the Escrow Agent is a licensed real estate broker, the Escrow Agent shall comply with the requirements of Chapter 475, Florida Statutes.

**STANDARD M—FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT (FIRPTA) WITHHOLDING.** A SELLER who is a U.S. citizen or resident alien and who furnishes BUYER with an affidavit attesting to same, is exempt from FIRPTA withholding. If SELLER is a foreign person or entity, BUYER shall deduct and withhold from the purchase price, or collect from SELLER if the net proceeds are insufficient, 15% of the purchase price (the "Withholding Amount"), and remit same to the Internal Revenue Service ( the "IRS") within 10 days after the Closing Date, unless: (1) the purchase price is not more than $300,000.00 and BUYER executes a sworn certification at closing attesting that BUYER is

Electronically Signed using eSignOnline™ [ Session ID : f1f7d344-70a0-47da-a67b-509b57e0354b ]

dotloop signature verification: dtlp.us/NFf2-XkRL-I9OI4Y

acquiring the Property for use as a residence; i.e. that BUYER or a member of BUYER's family has definite plans to reside at the Property at least 50% of the number of days the Property is used by any person in each of the first two 12-month periods immediately following the closing, in accordance with the Internal Revenue Code and all applicable regulations (the "BUYER's Residential Use Certification"), in which event the Withholding Amount is $0; or (2) the purchase price is greater than $300,000.00 but not more than $1,000,000.00 and BUYER executes a BUYER's Residential Use Certification, in which event the Withholding Amount is reduced to 10% of the purchase price. If SELLER furnishes to BUYER, not later than the Closing Date, proof of submittal to the IRS of an application for withholding certificate, the closing agent (or other third party mutually designated by SELLER and BUYER) shall hold the applicable Withholding Amount in escrow pending receipt of the withholding certificate, shall remit the sum reflected in the withholding certificate to the IRS within 10 days of receipt of the withholding certificate, and shall promptly refund any remaining balance to SELLER. SELLER shall hold BUYER harmless and indemnify BUYER for not withholding or collecting the applicable Withholding Amount or for withholding and remitting the reduced amount reflected in the withholding certificate. BUYER shall provide to SELLER evidence of remittance of all or any portion of the applicable Withholding Amount to the IRS. The failure of either party to comply or to allow compliance with the requirements of FIRPTA and related regulations shall constitute a breach of this Contract.

**STANDARD N—QUICK CLOSING.** Except with respect to the Clearance Period in Standard B or as otherwise set forth in Standard J, if the Closing Date does not allow sufficient time for performances by SELLER and BUYER within the time frames and by the deadlines set forth in this Contract, the parties agree to undertake and complete all performances, inspections, surveys, examinations, delivery of documents, notices, satisfaction of contingencies and all other actions required of or allowed to either party prior to the Closing Date, except that the statutory time period set forth in Standards H and I shall not be affected by this provision.

**STANDARD O—DEFAULT AND REMEDIES.** If BUYER does not perform BUYER's obligations hereunder (except as excused by SELLER's default) all deposits made shall be paid to SELLER as liquidated damages, which shall be SELLER's exclusive remedy. If SELLER does not perform SELLER's obligations hereunder (except as excused by BUYER's default), BUYER may enforce this Contract by a suit for specific performance, damages, or may terminate this Contract.

**STANDARD P—LITIGATION; ATTORNEY FEES AND COSTS.** In connection with any litigation concerning this Contract, venue shall be in the county where the Property is located, and the prevailing party shall be entitled to recover reasonable attorney fees and court costs, including on any appeals, from the non-prevailing party. The term "prevailing party" shall include SELLER, BUYER, and any broker acting in an agency or non-agency relationship recognized under Chapter 475, Florida Statutes. For purposes of this Standard, any such broker shall be an intended third party beneficiary.

**STANDARD Q—NOTICES, DISCLOSURES, ACKNOWLEDGMENTS AND DOCUMENTS.** All notices, disclosures and acknowledgments must be in writing. Unless a party is required by law to deliver notices, disclosures, acknowledgments or documents directly to the other party, all notices, disclosures, acknowledgments and documents required or permitted under this Contract shall be effective when given by a party or that party's broker or attorney to the other party or said other party's broker or attorney. Delivery of homeowners' or condominium documents required under Standards H and I respectively to BUYER's broker or attorney shall not constitute delivery to the BUYER.

**STANDARD R—MISCELLANEOUS.** (1) **The parties have agreed to deal in good faith with respect to all provisions of this Contract.** (2) The singular case or tense shall include the plural case or tense. (3) This Contract may only be modified in writing signed by the parties. (4) Except as otherwise specifically provided, all references to days shall mean calendar days. (5) Except as otherwise specifically provided, all deadlines shall expire at 11:59 PM Eastern Time. Except as otherwise expressly provided by law, if the Closing Date, any deadline or the last day of any time period falls on a Saturday, Sunday, or federal legal holiday, said deadline shall be extended to the following business day. (6) As used herein, the terms "real estate broker" or "broker" shall include all real estate brokers, brokerage corporations or business entities, and their respective licensees involved in this transaction. (7) All title evidence and other documents provided to BUYER by or on behalf of SELLER are the property of SELLER until closing and shall be immediately returned to SELLER if this Contract is terminated. (8) If either SELLER or BUYER is permitted to terminate this Contract, said party shall do so by giving notice of said termination to the other party, whereupon all deposits made by BUYER shall be promptly returned to BUYER, this Contract shall be of no further force and effect, and the parties shall have no further liability to one another hereunder except as set forth herein. (9) The headings used in this Contract are for convenience of reference only and shall not be used for interpreting the meaning of any provisions of this Contract. (10) All provisions of this Contract which by their nature or context require performance or provide rights after the Closing Date, including without limitation the provisions of Standard P, shall survive closing. (11) Signatures and initials communicated by electronic or facsimile transmission shall be binding. (12) A facsimile or electronic (including "pdf") copy of this Contract and all related sale documents, and any signatures thereon shall be considered for all purposes as an original. This Contract and all related sale documents may be executed by use of electronic signatures, as determined by Florida's Electronic Signature Act and other applicable laws. (13) This Contract and all related sale documents may be signed in counterparts and said counterparts shall collectively constitute the entire agreement of the parties. (14) Upon reasonable notice, SELLER shall provide access to the Property to

Electronically Signed using eSignOnline™ [ Session ID : f1f7d344-70a0-47da-a67b-509b57e0354b ]

dotloop signature verification: dtlp.us/NFf2-XkRL-I9Ol!4Y

appraiser(s) and surveyor(s) retained by BUYER. (15) SELLER and BUYER authorize the closing agent to provide copies of the American Land Title Association (ALTA) and other settlement statements to all parties, brokers and attorneys associated with this transaction.

**STANDARD S—NEGOTIATED TERMS; REPRESENTATIONS. Any and all terms negotiated between the parties must be written into this Contract.** BUYER's decision to buy was based upon BUYER's own investigations of the Property. BUYER holds the broker(s) harmless from all liability or loss caused by SELLER's failure to disclose material facts in accordance with this Contract, or SELLER's representations regarding the Property's condition, or from broker's referral, recommendation, or retention of any vendor. The parties agree that assistance to a party by a broker does not, and will not, make the broker responsible for performance.

**STANDARD T—BINDING CONTRACT; LEGAL COUNSEL.** THE PARTIES ARE NOT REQUIRED TO USE ANY PARTICULAR FORM OF CONTRACT. TERMS AND CONDITIONS SHOULD BE NEGOTIATED BASED UPON THE RESPECTIVE INTERESTS, OBJECTIVES AND BARGAINING POSITIONS OF THE PARTIES. APPROVAL OF THIS FORM BY THE COLLIER COUNTY BAR ASSOCIATION AND ASSOCIATIONS OF REALTORS DOES NOT CONSTITUTE AN OPINION THAT ANY OF THE TERMS AND CONDITIONS IN THIS CONTRACT SHOULD BE ACCEPTED BY A PARTY IN A PARTICULAR TRANSACTION. THIS IS A LEGALLY BINDING CONTRACT FORM. EACH PARTY ACKNOWLEDGES THAT PRIOR TO SIGNING THE CONTRACT, THE CLOSING EXPENSES HAVE BEEN EXPLAINED, REAL ESTATE TRANSACTION STANDARDS A THROUGH T HAVE BEEN RECEIVED AND REVIEWED, AND THAT PARTY HAS BEEN ADVISED BY THE REAL ESTATE BROKER TO SEEK LEGAL COUNSEL AND TITLE INSURANCE TO PROTECT THAT PARTY'S INTEREST IN CONNECTION WITH THE TITLE STATUS AND CLOSING OF THIS TRANSACTION. BUYER AND SELLER ARE ADVISED TO CONSULT AN APPROPRIATE PROFESSIONAL FOR LEGAL, TAX, PROPERTY CONDITION, ENVIRONMENTAL, AND OTHER SPECIALIZED ADVICE. THIS CONTRACT SHALL BE BINDING UPON AND INURE TO THE BENEFIT OF THE PARTIES HERETO, THEIR HEIRS, ADMINISTRATORS, PERSONAL REPRESENTATIVES, AND SUCCESSORS IN INTEREST.

**OTHER TERMS AND CONDITIONS**:

**ADDENDUM:** The following Addendum/Addenda is/are attached hereto and incorporated into this Contract:

To the extent such Addendum/Addenda terms conflict with the terms of this Contract, the Addendum/Addenda terms shall control.

**THE REAL ESTATE TRANSACTION STANDARDS SHOULD NOT BE REVISED OR MODIFIED EXCEPT IN OTHER TERMS AND CONDITIONS AND/OR BY ADDENDUM/ADDENDA. WIRE FRAUD ADVISORY. CYBER CRIMINALS ATTEMPTING TO STEAL LARGE SUMS OF MONEY ARE TARGETING REAL ESTATE TRANSACTIONS BY INTERCEPTING ELECTRONIC COMMUNICATIONS AND SENDING EMAILS THAT APPEAR TO BE FROM REAL ESTATE AGENTS, BROKERS, ATTORNEYS, TITLE COMPANIES, LENDERS AND OTHERS INVOLVED IN REAL ESTATE TRANSACTIONS. THESE CRIMINALS HAVE INTERCEPTED WIRE TRANSFER INSTRUCTIONS, OBTAINED ACCOUNT INFORMATION, AND, BY ALTERING SOME OF THE DATA, USED EMAILS TO CONVINCE BUYERS, SELLERS AND OTHERS TO REDIRECT THE MONEY TO A FRAUDULENT ACCOUNT. THESE EMAILS ARE SOPHISTICATED AND MAY LOOK LIKE LEGITIMATE EMAILS FROM PARTIES INVOLVED IN THE TRANSACTION. BUYER AND SELLER ARE STRONGLY ENCOURAGED NOT TO SEND PERSONAL INFORMATION, SUCH AS BANK ACCOUNT NUMBERS OR OTHER NON-PUBLIC INFORMATION, VIA UNSECURED EMAIL OR OTHER ELECTRONIC COMMUNICATION, AND TO NEVER WIRE TRANSFER MONEY WITHOUT PERSONALLY SPEAKING WITH THE INTENDED RECIPIENT OF THE WIRE TRANSFER TO VERIFY THE ROUTING AND ACCOUNT NUMBERS. BUYER AND SELLER HEREBY AGREE TO INDEMNIFY AND HOLD HARMLESS ESCROW AGENT, ANY CLOSING AGENT AND ANY BROKER ACTING IN AN AGENCY OR NON-AGENCY RELATIONSHIP RECOGNIZED UNDER CHAPTER 475, FLORIDA STATUTES, FROM ALL LOSSES, LIABILITIES, CHARGES AND COSTS INCURRED DUE TO ANY WIRE TRANSFERS OR WIRE INSTRUCTIONS WHICH RELATE TO THE TRANSFER OR ISSUANCE OF FUNDS. FOR PURPOSES OF THIS PARAGRAPH, ESCROW AGENT, ANY CLOSING AGENT AND ANY BROKER SHALL BE INTENDED THIRD-PARTY BENEFICIARIES.**

Electronically Signed using eSignOnline™ [ Session ID : f1f7d344-70a0-47da-a67b-509b57e0354b ]

dotloop signature verification: dtlp.us/NFf2-XkRL-I9Ol4Y

| | |
|---|---|
| Ryan VanderHeiden 2/6/2022 12:52 PM CST | Scott Beale dotloop verified 02/05/22 3:45 PM EST PBK9-CX8B-YGTV-BJNA |
| (Seller's Signature) (Date) | (Buyer's Signature) (Date) |
| Ryan Vander Heiden | Scott Beale |
| (Seller's Printed Name) | (Buyer's Printed Name) |
| Dawn VanderHeiden 2/6/2022 12:53 PM CST | |
| (Seller's Signature) (Date) | (Buyer's Signature) (Date) |
| Dawn Vander Heiden | |
| (Seller's Printed Name) | (Buyer's Printed Name) |

**SELLER rejects BUYER'S offer on ________________________________{Insert Date}.**

(Seller's Signature) (Seller's Signature)

**IDENTIFICATION OF BROKERS AND LICENSEES**

Listing Brokerage: Premier Sotheby's International Realty Selling Brokerage: Platinum Real Estate

Listing Licensee: Larry Caruso Selling Licensee: Denise Zervos/ Mark Zervos

**IDENTIFICATION OF ESCROW AGENT**

Escrow Agent's Name: Venture Title Services - Ryan Marrie

Escrow Agent Address: 1421 Pine Ridge Road, Naples Florida 34109

Escrow Agent Telephone: 239-734-2400/216-978-8260 Fax: ____________ Email: ryanmarrie@venturetitleservices.com

**THIS CONTRACT SHALL NOT MODIFY THE LISTING CONTRACT OR ANY MLS OR OTHER OFFER OF COMPENSATION MADE BY SELLER OR LISTING BROKER TO COOPERATING BROKERS.**

Electronically Signed using eSignOnline™ [ Session ID : f1f7d344-70a0-47da-a67b-509b57e0354b ]

# EXHIBIT 6

# NOVA HOMES OF SOUTH FLORIDA, INC.
## RESIDENTIAL CONSTRUCTION CONTRACT

This Agreement is made on this 22nd day of February, 20 22 by and between NOVA HOMES OF SOUTH FLORIDA, INC. hereinafter "NOVA HOMES" or "Contractor"; and

Name: Scott and Jennifer Beale

Social Security/FEIN: ____

Address: 8211 Lakeshore Blvd

City, State Zip: Mentor OH 44060

Home Telephone: ____

Office Telephone: 757-271-1600

Cell Phone: 404-925-4432

Fax: ____

Email: sbeale96@gmail.com

hereinafter "OWNER", the plural shall be treated as the singular, for the consideration recited herein, NOVA HOMES agrees to construct a single-family residence and related improvements, for and in consideration of the Contract Price to be paid for by the OWNER as stated below, upon the following property:

Legal Description: MARCO BCH UNIT 3 BLK 94 LOT 10 OR 1359 PG 2342

Street Address: 127 Gulfport Ct. Marco Island FL 34145

Parcel ID: 56865440008

**1. Exhibits:**

1.1 Attached hereto and incorporated herein are the following exhibits:

Exhibit A- Allowances
Exhibit B- Extras and Upgrades
Exhibit C- Specifications
Exhibit D- Plans (to be initialed by OWNER(S))

Initials: SB

**2. Contract Price:**

2.1 In consideration for NOVA HOMES work and obligations hereunder, OWNER shall pay NOVA HOMES for the model known as home as subject to additions or deductions for agreed changes in specifications, the fixed contract sum of Custom "IBIS" not to exceed 2,375 SF Living with 3,455 SF Total Build Total Price = $923,274 as follows:

2.1.1 Non-refundable Deposit Due upon signing of contract: $20,000

2.1.2 Balance of construction account to be disbursed to NOVA HOMES pursuant to the schedule listed in section three below: $903,274.

2.1.3 The Contract Price includes all materials, labor, and permitting fees, including impact fees, necessary for the construction of the work. The parties acknowledge that this is a fixed price contract. NOVA HOMES shall be responsible for any cost overruns for fully performing the contract, including, but not limited to, costs of labor and materials as well as lost deposits placed with subcontractors. The cost of surveys and plot plans included in the Contract Price.

**3. Construction Draws:**

3.1 To be disbursed in accordance with the bank or lending institution's draw schedule.

3.1.1 All construction draws shall be dispersed from the OWNER's bank or lending institution (if applicable) directly to NOVA HOMES. All inspections will be performed by the bank or lending institution inspector and according to the construction draw schedule. Any costs associated with any such inspections shall be borne by the OWNER. Upon acceptance of this contract by OWNER, the deposit set forth above will be paid to NOVA HOMES by OWNER. Payment of the deposit by OWNER shall be evidence of OWNER's instruction to NOVA HOMES to commence construction.

3.1.2 If the OWNER is financing the construction of improvements with an institutional lender, any changes to the draw schedule must first be approved in writing by NOVA HOMES. All installments shall be due and payable within five (5) calendar days of request made to OWNER, or OWNER's lender, if OWNER is financing the construction improvements. OWNER agrees to execute all draw requests and checks issued by any such lender within (5) calendar days from the date of said draw request.

Initials: [signature]

If the installments are not paid within the stipulated time, (5) calendar days, all work shall cease until installments are met. If such delays in construction cause additional construction interest or extension fees, miscellaneous fees, etc. OWNER shall pay such construction interest and/or fees due to the delays caused by nonpayment or delayed payment of draw.

3.1.3 If the OWNER is utilizing out of pocket means for payment, the following draw schedule will apply:

20% - When Permit is Ready for Issue
15% - Pouring of Slab
15% - Roof Dry-in
15% - Windows, Exterior Doors, All Rough-in & Insulation
15% - After Drywall, Stucco, and Paint
15% - After Kitchen Cabinets, Floor Tile, and Bath Wall Tile
5% - Obtaining Certificate of Occupancy (CO)

4. **Allowances:**

4.1 The Contract Price shall include the allowance amounts set forth in **Exhibit A**. Whenever the actual cost of an allowance item is more or less than the allowance, the contract sum shall be adjusted accordingly. Any increase in the allowance shall be paid prior to the time the goods or services are ordered by NOVA HOMES. Any decreases shall be applied against any completed increases. If any decreases remain upon completion of construction, any such decreases shall be applied against the final draw.

5. **Financing:**

5.1 Within five (5) calendar days the OWNER will apply for a conventional construction/permanent mortgage loan from a lender approved by NOVA HOMES and use diligent effort and cooperate with the lender in obtaining an approval. OWNER agrees to make available and allow the financial institution to make available any/all appraisals performed as part of this process to NOVA HOMES. Should lender fail to approve OWNER for mortgage, OWNER must use diligent efforts to secure financing through another (second) lender approved by NOVA HOMES.

5.2 If mortgage financing is not approved by second lender within sixty (60) days and closed within thirty (30) days following mortgage approval (or such later dates as NOVA HOMES and OWNER agree) this agreement will be terminated and the initial non-refundable deposit by OWNER refunded, less any amount due to NOVA HOMES for out of pocket expenses by NOVA HOMES on behalf of OWNER, and all parties will be released of any and all

Initials: 96 ___

obligations or liabilities to the other with respect to this Contract.

5.3 In the event customer has been financially approved, and determines not to continue with construction procedures, NOVA HOMES will be compensated with the total amount deposited as liquidated damages.

5.4 In the event that NOVA HOMES has incurred more out of pocket expenses than the amount of the initial non-refundable deposit, NOVA HOMES will receive reimbursement of these out of pocket expenses from OWNER, immediately.

5.5 When mortgage financing is approved and closed, NOVA HOMES will be paid in accordance with the draw schedule and procedures agreed to by the OWNER, NOVA HOMES, and lender. No construction draw shall be withheld by OWNER for any alleged defect or omission in the course of construction and all such draws shall be paid directly to NOVA HOMES and not to any subcontractor or vendor servicing or supplying NOVA HOMES.

5.6 If for any reason NOVA HOMES is not paid a draw when requested and due, agreement such nonpayment shall, without further notice or action, be default under this agreement and shall permit NOVA HOMES at its option, to suspend or terminate construction, to bring an action for the specific enforcement of this agreement and to exercise all other rights (including but not limited to lien rights) under the laws of Florida to collect the full value of material and services provided as well as such damages as may be lawful late payment shall bear per diem interest at the highest rate allowed under the Florida law.

6. Interest:

6.1 All moneys not paid to NOVA HOMES when due shall bear interest at the maximum legal rate in force at the time under Florida law.

6.2 At no time shall NOVA HOMES be responsible for construction loan interest. OWNER agrees to hold harmless and indemnify NOVA HOMES from the payment of any construction loan interest.

7. Cash Purchase:

7.1 Should OWNER pay cash for construction, and after execution, terminate this agreement within three (3) days of last signed date appearing on Contract, this agreement will be terminated and the initial deposit by OWNER refunded, less any amount due to NOVA HOMES for any out of pocket expenses incurred by

Initials: SG

NOVA HOMES on behalf of the OWNER, and all parties will be released from any and all obligations or liabilities to the other with respect to this Contract, unless this provision is waived by either party.

7.2 In the event that NOVA HOMES has incurred more out of pocket expenses than the amount of the initial deposit, NOVA HOMES shall be reimbursed for these out of pocket expenses by the OWNER, immediately.

7.3 Should OWNER terminate this agreement after three (3) days of last signed date appearing on Contract, this Contract shall stand terminated and the deposit shall be forfeited and paid to NOVA HOMES as liquidated damages.

**8. Construction Schedules and Delays:**

8.1 NOVA HOMES shall only adhere to its own construction schedule and shall at no time be held responsible to adhere to any construction schedule set by any third-parties. All construction schedules set by third-parties require NOVA HOMES written approval.

8.2 Any delay caused by the OWNER that results in the escalation of prices of materials or labor shall be borne by the OWNER, and therefore shall be added to the existing Contract Price without violation to the Contract.

8.3 Any delay caused by an Act of God or other unforeseeable circumstance that results in the escalation of prices of materials or labor may be mediated by the parties without violation of the Contract.

**9. Materials and Labor:**

9.1 NOVA HOMES shall furnish all material, labor, equipment, tools, machinery and supplies necessary for the construction of said residence in substantial accordance with the contract documents and all applicable building codes.

9.2 All work shall be performed in a good and workmanlike manner. NOVA HOMES shall assure that all subcontractors it employs are licensed and insured.

Initials: SD

**10. Insurance:**

10.1 NOVA HOMES shall purchase and maintain the following insurance:

10.1.1 Standard comprehensive general liability policy protection against liability for bodily injury or property damage with an aggregate limit of not less than $1,000,000.00 for bodily injury and $1,000,000.00 for property damage. Coverage shall include products, completed operations and personal injury.

10.1.2 Standard Builders Risk Policy in the amount of not less than the Contract Price naming OWNER and OWNER's lender (if applicable) as co-insured insuring against physical loss and damage to the property under construction. Coverage shall include but not be limited to, protection against fire, lighting, windstorm, hail, explosions, smoke, riots, vandalism, and malicious mischief.

10.2 Upon the issuance of the Certificate of Occupancy, NOVA HOMES insurance policy will terminate, and shall be the obligation of the OWNER to obtain homeowner's insurance on the subject property.

10.3 At the request of OWNER, NOVA HOMES shall furnish to OWNER (and lender at OWNER's request) certificate or copies of policies providing the above coverage, showing such insurance as in force and the premiums due there under have been paid. If the project is destroyed or damaged by accident or disaster such as fire, storm or flood, work done by NOVA HOMES in rebuilding or restoring the project shall be paid for by OWNER as extra work. However, OWNER will be credited in the exact amount NOVA HOMES receives insurance proceeds, amount credited not to exceed expenditures/draws OWNER has given toward the house.

**11. Notice to Owner:**

11.1 The OWNER is hereby instructed to timely provide NOVA HOMES with a copy of each Notice to Owner that is received by the OWNER. OWNER must provide such timely notice as a condition precedent to establishing liability on NOVA HOMES' part. Failure to provide NOVA HOMES with such timely notice shall be an absolute defense to liability on any claim of lien.

**12. Notice of Commencement:**

12.1 OWNER agrees, at no cost to NOVA HOMES, to record a Notice of Commencement and provide a certified copy for posting on the

Initials: SB

construction site. No work shall commence until such notice is recorded and posted.

13. **Cosmetic Change Orders:**

13.1 This paragraph shall apply to cosmetic changes only, not structural changes. OWNER shall have no right to order cosmetic changes to the construction unless the cosmetic change and the additional price for said change have been agreed to in advance by NOVA HOMES.

13.2 Cosmetic change orders shall be made in writing, but NOVA HOMES is entitled to and shall be paid for extra work, whether the extra work order is reduced to writing or not, provided any such work was at the request or direction of OWNER.

13.3 In the event that OWNER approves any cosmetic change order, the agreed upon cost for any such additional work shall be paid to NOVA HOMES by OWNER within five (5) days after approval of any such request by OWNER or completion of the work by NOVA HOMES whichever comes first.

13.4 In the event that the OWNER requests a cosmetic change order and fails to pay the cost of such cosmetic change within the specified herein, NOVA HOMES shall not be obligated to defer construction scheduling that may be required to construct the change and has the right to construct the house as originally planned.

13.5 All cosmetic change orders must be made directly with NOVA HOMES and not to any sub-contractor which are performing work for NOVA HOMES. NOVA HOMES shall not be responsible for any cosmetic change orders not requested through NOVA HOMES. Color selection shall not be defined as a cosmetic change for the purpose of this paragraph.

14. **Color Selection and Changes:**

14.1 Once OWNER has made a color selection for the home, OWNER shall not request NOVA HOMES to change the color selected. OWNER acknowledges that the color selection process is completed once OWNER has chosen a color selection for the home.

14.2 OWNER agrees to hold NOVA HOMES harmless for refusing to honor any subsequent requests for color selection changes after the initial decision for a color selection has been made.

Initials: Sb

**15. Structural Changes:**

15.1 It is the OWNER's responsibility to ensure that the plans submitted to NOVA HOMES, whether from a selection of NOVA HOMES' homes or from an outside source, are a complete and accurate depiction of what OWNER desires to have built upon the property.

15.2 NOVA HOMES shall only construct upon the property the type, style, and design of home found in those plans that the OWNER had initially submitted to NOVA HOMES.

15.3 NOVA HOMES shall not whatsoever accept or construct any modifications to that plan subsequent to that plan's initial submission to NOVA HOMES. No structural change orders, modification requests, or the like shall be submitted to NOVA HOMES once the initial plans have been submitted to NOVA HOMES.

15.4 OWNER acknowledges the importance of ensuring that the initial plans are suitable for the type, style, and design of home OWNER desires and shall hold NOVA HOMES harmless for refusing to honor any subsequent structural changes requested to the plans after initial submission to NOVA HOMES.

15.5 OWNER represents that any plans, drawings, or other documents that OWNER submits to NOVA HOMES have been properly paid for, is allowed to be used by its creator, and is not subject to any potential copyright, patent, or trademark dispute. OWNER shall indemnify NOVA HOMES, including attorney fees and costs, and hold NOVA HOMES harmless for refusing to commence construction under this Contract, if NOVA HOMES is made aware of such a dispute. Failure to provide written notification to NOVA HOMES of said potential dispute is a material breach of this Contract. Failure to resolve this dispute in a timely manner shall also be a material breach of this Contract.

**16. Variances and Changes:**

16.1 In construction certain changes in the plans, specifications and materials may be desirable or required by governmental authorities, job conditions, product availability or design changes by NOVA HOMES and are authorized by this Contract provided that any such changes within control of NOVA HOMES shall not materially and adversely affect the size, quality, value or essential characteristics of the home. Certain items, such

Initials: SB

as paint, tile, cabinets and appliances, are also subject to design changes by the manufacturer and shading in color and graduations.

16.2 NOVA HOMES shall adhere to the installation of the requested features chosen by owner at closing. However, NOVA HOMES reserves the right to choose a feature of like quality, price, and kind if the feature requested by owner cannot be installed for whatever reason. NOVA HOMES further reserves the right to install whatever feature it can at its own discretion if NOVA HOMES cannot find a feature of like quality and kind similar to owner's choice. Any differences in price shall be debited or credited accordingly.

17. **Concealed Conditions Concerning Property:**

17.1 It is the OWNER's responsibility to ensure that the property can be legally constructed upon. The OWNER shall be responsible to ensure that the property meets all of the requirements under federal, state and local land development regulations. The OWNER shall hold harmless and indemnify NOVA HOMES for any damages for OWNER failing in this responsibility. The OWNER shall also reimburse NOVA HOMES for any damages NOVA HOMES has suffered for OWNER failing in this responsibility, including but not limited to reimbursing NOVA HOMES without delay, which shall mean within seven (7) calendar days from written notification, for any costs NOVA HOMES has incurred in paying sub-contractors, material contractors, etc.

17.2 Except for ensuring that the soil can be constructed upon, OWNER is responsible for any natural or unnatural, known or unknown, foreseeable or unforeseeable construction obstacle found on or below the surface of the property.

17.3 Construction obstacle shall be defined for the purposes of this Contract to mean any unsuitable material be it exotic vegetation, tree stumps, clay, limestone, rock, tree roots, etc. or any man made material made from plastic, steel, etc. found on or below the property that must be removed prior to the commencement or completion of any part or whole of the construction of said property. OWNER shall hold NOVA HOMES harmless and indemnify NOVA HOMES for any damages resulting from the removal of any such obstacle, including but not limited to any delays in construction. OWNER shall also without delay, which shall mean within seven (7) calendar days from written notification of the existence of such construction obstacle, advance the cost or reimburse NOVA HOMES for the removal, transportation, disposing, recycling, etc. of such construction obstacle. NOVA HOMES has the sole discretion as to which

Initials: SB

natural or unnatural item, material, or condition, such as trees, rocks bushes, shrubs, etc., shall remain upon the property, OWNER acknowledges same.

17.4 Extra Onsite fill may be required to fill-in holes left behind by the removal of large rocks and other construction obstacles. OWNER acknowledges and agrees that if any extra onsite fill is required to construct OWNER's home that such extra onsite fill amount shall be a separate cost and not part of the Contract price. NOVA HOMES shall at its own discretion determine the amount of such an allowance for the extra onsite fill. OWNER authorizes NOVA HOMES to deduct any such costs or expenses from such allowance immediately without delay or reservation.

17.5 In addition to all of the provisions above, if rock removal is required for the installation of the septic tank or drain field, the OWNER agrees that the cost of such removal will be automatically added to the contract price.

17.6 In addition to all of the provisions stated within this Contract, the OWNER acknowledges that the Contract includes all fill to be imported to the lot to bring the lot to required elevation by the county. If the lot is deemed to be a "wetland" and additional fill than that used in a regular lot is needed, then the OWNER agrees that the extra fill cost will be automatically added to the contract price.

**18. Concealed Conditions Concerning Implementation of Working Drawings:**

18.1 NOVA HOMES discovers that a portion of the drawings, although shown on the drawing, will be unable to be constructed, NOVA HOMES agrees to inform OWNER of this fact. OWNER agrees that should changes be required to the implementation of the drawings, OWNERS will reimburse NOVA HOMES for any extra expense incurred by NOVA HOMES to implement changes in the plans. NOVA HOMES has sole discretion as to the required remedy when such a situation is encountered.

**19. Control of Site, Activities During Construction, Walk Through, and Punch List at Completion of Construction:**

19.1 The OWNER agrees that NOVA HOMES shall control the lot and construction while the home is being built and until closing. Restrictive requirements of governmental agencies and insurance carriers prevent NOVA HOMES from permitting OWNER and their agents from performing work on the lot and home during NOVA HOMES control and no such work shall be performed. OWNER shall not interfere with workmen during working hours. Any questions concerning the work or

Initials: SB

other inquires shall be directed to NOVA HOMES and not to the sub-contractors.

19.2 No negotiating of additional/upgrade work shall be made with sub-contractor. If NOVA HOMES learns or observes work not negotiated with NOVA HOMES but directly agreed upon by OWNER directly to sub-contractor, OWNER agrees to pay NOVA HOMES the price/sum stipulated by NOVA HOMES irregardless of amount paid directly to sub-contractor. NOVA HOMES shall not guarantee such work since such work was not arranged through the normal channels at the offices of NOVA HOMES but directly through a sub-contractor, nor be responsible of soundness/quality of such work.

19.3 At the completion of construction OWNER will walk through the home with NOVA HOMES' representative and prepare a "punch list" of alleged construction defects. Except where specifically set forth in the plans and specifications, generally accepted construction standards shall govern NOVA HOMES' obligation and the determination of construction defects. NOVA HOMES will correct actual defects that are found to exist within thirty (30) days of walk through. The existence of punch list items shall not, however, delay the payments to NOVA HOMES. NOVA HOMES may elect, in its sole discretion, to delay closing and occupancy by the OWNER until alleged defects are satisfied and the OWNER, in writing, accepts the home in present form. No "escrow" or hold backs of closing funds will be permitted.

**20. Right to Stop Work and Option to Terminate:**

20.1 NOVA HOMES shall have the right to stop work if payments are not made when due under this Contract. If the work is stopped for a period of sixty (60) days or more by the order of any court or by the order of any other public authority, through no fault of NOVA HOMES or of anyone employed by it, or if the work is stopped for a period of sixty (60) days or more because of neglect of the OWNER, or if the OWNER fails to make any payment to NOVA HOMES within ten (10) days from the time that it is due, then NOVA HOMES, upon written notice to the OWNER, may stop work or terminate the contract and recover payment from the OWNER for all work completed and for all loses sustained on any materials, machinery, equipment, or tools, including reasonable profit and damages. OWNER has no rights to any of NOVA HOMES' equipments regardless of the circumstance.

Initials: SO

**21. Additional Obligations Required of Owner:**

21.1 OWNER represents and warrants they are the sole owners of the real property described in this contract. OWNER shall provide NOVA HOMES a copy of the deed whereby OWNER acquired title to the property prior to the application for the building permit.

21.2 OWNER represents that the property is free and clear of all liens except any financing contemplated by this Contract.

21.3 OWNER is responsible for securing all zoning required for the construction of the home.

21.4 OWNER agrees to furnish data in respect to land surveys, easements, and reference points.

21.5 OWNER agrees to pay all costs regarding any and all closings, including the cost for title insurance. OWNER agrees that NOVA HOMES shall choose a title company of NOVA HOMES' own choice.

21.6 OWNER acknowledges that the timely possession of his/her/its home is contingent upon OWNER ensuring a timely closing. Closing for all intents and purposes herein shall mean completing all the terms and conditions required by a lender and NOVA HOMES in order for that lender to release the final draw to NOVA HOMES, such as performing a final walkthrough of the home, signing any and all required documentation approving the final walkthrough of the home, giving verbal or written authorization for lender to make the final release of payment, etc. OWNER agrees that a timely closing shall mean to take place no later than two (2) weeks from the date that the local governing authorities have issued a certificate of occupancy (CO) for his/her/its home. OWNER acknowledges that a failure to timely close on said home will result in uncertain costs to NOVA HOMES for which NOVA HOMES estimates to be at least one-hundred dollars ($100.00) per day after the timely closing period. OWNER agrees that this is a reasonable amount for costs incurred to NOVA HOMES, is a proper liquidated damages amount, and shall not be construed as a penalty .

21.7 OWNER shall pay any and all meter charges, garbage collection fees, and permanent utility deposits upon issuance of Certificate of Occupancy (CO). Any fees paid to NOVA HOMES on the OWNER's behalf shall be reimbursed to NOVA HOMES at time of closing. It is OWNER's responsibility to ensure that all utilities are turned on by the proper utility authority.

Initials: SB______

22. Completion, Occupancy, and Possession:

22.1 Until construction has been completed, a final certificate of occupancy issued, and all moneys due and payable to NOVA HOMES have been paid in full, possession of the home shall remain with NOVA HOMES and no furniture, fixtures, or personal property of any kind may be installed or placed in the home by OWNER and no person may occupy the home.

22.2 OWNER agrees to close, and/or modify the loan upon notice of closing from NOVA HOMES and/or financing office. NOVA HOMES receipt of the Certificate of Occupancy from the governing municipality is sufficient evidence that the home is ready to close and connection of utilities is not required precedent thereof.

22.3 OWNER has two (2) weeks from issuance of Certificate of Occupancy to effectuate final closing. Should closing be delayed later than two weeks due to no fault of NOVA HOMES, OWNER shall be liable for interest at the highest legal rate upon all moneys due to NOVA HOMES upon final closing.

22.4 OWNER will not occupy the residence until the following conditions are met: (1) construction has been completed, (2) final payment has been made, and (3) NOVA HOMES has given its written consent. OWNER shall not visit the site during construction without the express written consent of NOVA HOMES and only when NOVA HOMES agent or representative accompanies OWNER to any such visit. OWNER shall contact NOVA HOMES a minimum of 24 hours in advance to arrange a convenient time to visit the site during normal working hours. Because of the dangers of a construction site and because of insurance guidelines, only the OWNER of the property will be permitted on the site during such visits.

23. Clean-up:

23.1 NOVA HOMES shall at all times keep the site reasonably free from accumulation of waste material or rubbish caused by its operations. Upon completion of work, NOVA HOMES shall remove all rubbish caused by the operations hereunder, from the site as well as all of its tools, equipment, machinery, and surplus materials or as no longer needed, and leave the work or such portion in "broom clean" or equivalent condition.

Initials: SB

24. Warranty:

24.1 NOVA HOMES shall guarantee, for a period of one year from the time of issuance of Certificate of Occupancy, the home against defective workmanship and material, considering the construction standards for similar property in Collier County, Florida. This guarantee includes: the building, roof, plumbing, air conditioning, heating equipment and electrical work. This guarantee does not include hairline cracks, nail pops, tile breakage or cracking, grout cracks, or imperfections that may result from negligence, or poor maintenance by OWNER, or abused by OWNER, from natural settling of structure, or from an act of God, or incidental or consequential damages. This guarantee does not apply to any work or sweat equity performed by OWNER, for any work OWNER contracted directly with sub-contractor(s), or to dying or burned sod.

24.2 All requests to obtain warranty work shall be made in writing and delivered via certified mail through the U.S. Postal Office to the office of NOVA HOMES.

24.3 **THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, STATUTORY OR IMPLIED.**

25. Time is of the Essence:

25.1 Time is of the essence as to parties' performance under this Contract.

26. Notice:

26.1 Any notice under this Contract shall be in writing and shall be effective when actually delivered in person or three (3) days after being deposited in the U.S. mail, registered or certified, postage prepaid and addressed to the party at the address stated in this Contract or such other address as either party may designate by written notice to the other.

27. Waiver:

27.1 The waiver by either party of the breach of any provision of this Contract by the other party shall not operate or be construed as a waiver of any subsequent breach. At no time shall the failure of NOVA HOMES to provide a release or other writing whatsoever be constituted as a waiver of payment.

Initials: SB

28. Assignment:

28.1 Except as otherwise provided within this Contract, neither party hereto may transfer or assign this Contract without prior written consent of the other party.

29. Agreement Binding:

29.1 This Contract shall be binding upon the heirs, executors, administrators, successors, and assign of the parties hereto.

30. Dispute Resolution and Opportunity to Repair:

30.1 Any controversy of claim between OWNER and NOVA HOMES arising out of or related to this Contract, or the breach thereof, shall be settled by a two-step process:

30.1.1 Mediation.

The parties agree to relegate all controversies to mediation. Either party shall submit a controversy to mediation by providing written notice to the other. The mediation shall take place within ten (10) business days of written notice or the first available time on the mediator's calendar. The mediator shall be mutually chosen. If an agreement cannot be made on who shall serve as a mediator, then the OWNER may choose the mediator from a list of three mediators chosen by NOVA HOMES. The mediation proceeding shall take place in Collier County, Florida. The proceedings of any mediation shall be kept confidential and sealed. This step is a condition precedent to arbitration.

30.1.2 Arbitration.

If the parties do not settle the controversy at mediation, then, the parties shall submit their controversy to binding arbitration, which shall be conducted in the same manner and under the same procedure in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. Arbitration decisions shall be made according to the laws of Florida. Attorney's fees shall be awarded to the prevailing party in arbitration.

30.1.2.1 Notice of the demand for arbitration shall be served in writing to the other party of the agreement and filed with the American Arbitration Association. The demand for arbitration shall be made within a 30-day period after the

Initials: SG

claim, dispute or other matter in question has arisen, and in no event shall it be made after institution of legal or equitable proceedings based on the claim, dispute or other matter in question would be barred by applicable statute of limitations.

30.1.2.2 Contractor shall carry on the work and maintain the progress schedule during any arbitration proceedings, unless otherwise agreed in writing.

30.2 The parties agree that any dispute as to an alleged construction defect is governed by Florida Statute Section 558.004 entitled: Notice and Opportunity to Repair. This agreement incorporates each and every paragraph of Chapter 558, as applicable, herein. All required Notices shall be made in writing to NOVA HOMES at the address given above.

31. **Attorneys' Fees:**

31.1 In the event an arbitration, suit, or action is brought by any party under this agreement to enforce any of the items, or in any appeal therefore, it is agreed that the prevailing party shall be entitled to reasonable attorneys' fees to be fixed by the arbitrator, trial court, and/or appellate court.

32. **Venue and Governing Law:**

32.1 The venue for arbitration or any legal proceedings between OWNER and NOVA HOMES shall be County of Collier, State of Florida. The laws of the State of Florida shall govern the parties' interpretation and enforcement of this Contract.

33. **Severability:**

33.1 If any section of this Contract is found unenforceable or invalid that section shall be stricken but the remainder of the sections shall remain enforce or valid.

34. **Entire Agreement:**

34.1 This Contract contains the entire agreement between the parties and supersedes and replaces all prior or existing written or oral contracts between the parties.

Initials: SB

35. Radon Gas Disclosure:

35.1 Radon gas is a naturally occurring radioactive gas. When radon gas accumulates in a building in sufficient quantities it may present risks to persons who are exposed to it over time. Levels of Radon gas that exceed Federal State Guidelines have been found in Florida. Additional information regarding Radon testing may be obtained from your county public health unit.

36. REQUIRED DISCLOSURES FOR RESIDENTIAL CONTRACTS:

ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001-713.37, FLORIDA STATUTES), THOSE WHO WORK ON YOUR PROPERTY OR PROVIDE MATERIALS AND ARE NOT PAID IN FULL HAVE A RIGHT TO ENFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. THIS CLAIM IS KNOWN AS A CONSTRUCTION LIEN. IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS, OR MATERIAL SUPPLIERS OR NEGLECTS TO MAKE OTHER LEGALLY REQUIRED PAYMENTS, THE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR PAYMENT, EVEN IF YOU HAVE PAID YOUR CONTRACTOR IN FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR, YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON YOUR PROPERTY. THIS MEANS IF A LIEN IS FILED YOUR PROPERTY COULD BE SOLD AGAINST YOUR WILL TO PAY FOR LABOR, MATERIALS, OR OTHER SERVICES THAT YOUR CONTRACTOR OR A SUBCONTRACTOR MAY HAVE FAILED TO PAY. FLORIDA'S CONSTRUCTION LIEN LAW IS COMPLEX AND IT IS RECOMMENDED THAT WHENEVER A SPECIFIC PROBLEM ARISES, YOU CONSULT AN ATTORNEY.

37. CORRECTION OF DEFECTIVE WORK DISCLOSURE:

FLORIDA LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY (60) DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONALS THE OPPURTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED

Initials: SO

CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONALS. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.

38. CONSTRUCTION INDUSTRIES RECOVERY FUND DISCLOSURE:

PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A STATE-LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE AND ADDRESS:

CONSTRUCTION LICENSING BOARD
1940 NORTH MONROE STREET
TALLAHASSEE, FL 32399-0783
TEL: (850) 921-6593

39. MOLD DISCLOSURE:

MOLD IS A NATURALLY OCCURING FUNGUS THAT IS PREVALENT THROUGHOUT FLORIDA. THERE ARE MANY TYPES OF MOLD. SOME MOLD MAY BE TOXIC TO YOUR HEALTH. IT IS ESSENTIAL THAT YOU FREQUENTLY INSPECT YOUR HOME FOR THE PRESENCE OF SUCH MOLD. MOLD MAY ALSO OCCUR DURING ANY PHASE OF CONSTRUCTION. TO FIND OUT MORE ABOUT MOLD, PLEASE CONTACT YOUR LOCAL BUILDING DEPARTMENT OR A RESEARCH FACILITY. THERE ARE ALSO LICENSED PROFESSIONAL HOME INSPECTORS THAT MAY ASSIT YOU. IT IS IMPORTANT THAT YOU GET YOUR HOME INSPECTED FREQUENTLY FOR MOLD.

40. MOLD DISCLAIMER AND INDEMNIFICATION AGREEMENT

OWNER AGREES THAT HE/SHE HAS READ AND UNDERSTOOD THE MOLD DISCLOSURE. OWNER AGREES THAT CONTRACTOR HAS MADE HIM/HER AWARE OF THE IMPORTANCE OF OBTAINING A SPECIALIST TO INSPECT THE HOME FOR MOLD. OWNER AGREES THAT CONTRACTOR HAS TOLD HIM/HER TO GET A FREQUENT INSPECTION FOR THE OCCURRENCE OF MOLD AND THAT AN INITIAL FAVORABLE INSPECTION DOES NOT MEAN THAT MOLD MAY NOT OCCUR LATER ON. OWNER AGREES THAT CONTRACTOR HAS TOLD HIM/HER THAT

Initials: SO

MOLD MAY OCCUR DURING CONSTRUCTION, ESPECIALLY IF THERE IS ANY DELAY IN CONSTRUCTION.

OWNER AGREES TO HOLD HARMLESS AND INDEMNIFY CONTRACTOR IF MOLD IS FOUND AT THE JOB SITE WHETHER OR NOT SUCH OCCURRENCE OF MOLD MAY OR MAY NOT BE ATTRIBUTED TO CONTRACTOR'S PERFORMANCE AT THE JOB SITE. OWNER AGREES THAT CONTRACTOR IS NOT RESPONIBLE FOR THE OCCURRENCE OR THE EFFECTS THAT MOLD MAY HAVE ON HIMSELF/HERSELF, CONTRACTOR, SUBCONTRACTOR, AND OTHER THIRD-PARTIES. THIS CLAUSE SURVIVES THE CONTRACT.

41. WETLANDS DISCLOSURE:

WETLANDS ARE STATE AND FEDERALLY PROTECTED LANDS FOR ENVIRONMENTAL PURPOSES. IF A LAND IS DESIGNATED AS A WETLAND, IT MAY OR MAY NOT BE ABLE TO BE BUILT UPON. A LAND MAY BE DESIGNATED PARTIALLY OR ENTIRELY AS A WETLAND. OWNER UNDERSTANDS THAT IT IS OWNERS OBLIGATION, NOT CONTRACTORS OBLIGATION, TO VERIFY THAT HIS/HER LAND IS NOT DESINATED AS A WETLAND.

42. WETLANDS DISCLAIMER AND INDEMNIFICATION AGREEMENT

IF OWNER'S LAND IS DESIGNATED AS A WETLAND, WHETHER IN ITS ENTIRETY OR NOT, THEN OWNER AGREES TO HOLD HARMLESS AND INDEMNIFY CONTRACTOR FOR ANY DAMAGES SUFFERED BY CONTRACTOR OR ANY OF ITS SUBCONTRACTORS, MATERIAL CONTRACTORS, OR OTHER PERSONS OR ENTITIES RELATED TO THE CONSTRUCTION OF OWNER'S HOME.

CONTRACTOR AGREES TO REFUND OWNER ALL OF HIS/HER CONSTRUCTION FUNDS NOT ALREADY EXPENDED MINUS ANY EXPENSES RELATED TO SAID CONSTRUCTION IF OWNER'S PROPERTY IS CLASSIFIED AS WETLANDS, WHETHER IN WHOLE OR PART, BUT ONLY IF CONSTRUCTION WOULD NOT BE FEASIBLE AS A RESULT OF SAID DESIGNATION. IF CONSTRUCTION IS ALLOWED ON OWNER'S LAND DESPITE SAID DESIGNATION, THEN OWNER AGREES TO PAY ALL FEES AND EXPENSES RELATED TO BUILDING UPON LAND WITH SAID DESIGNATION, SUCH FEES, PERMIT FEES, ENVIRONMENTAL IMPACT STUDIES, LEGAL FEES, ETC.

OWNER AGREES THAT SUCH FEES AND EXPENSES ARE NOT INCLUDED IN THE ORIGINAL CONTRACTED PRICE AND ARE TO CONSIDERED

Initials: SB

<u>EXTRAS THAT MAY BE PAID FROM ANY ALLOWANCES PROVIDED TO CONTRACTOR AND AT CONTRACTOR'S SOLE DISCRECTION. OWNER AGREES THAT CONTRACTOR IS ALLOWED AT CONTRACTOR'S SOLE DISCRETION TO DEDUCT ANY SUCH FEES OR EXPENSES FORM ANY AVAILABLE ALLOWANCES.</u>

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

ACCEPTED BY:

/S/ ____________________
Owner

/S/ ____________________
NOVA HOMES

This contract was prepared by:
Neil Morales, Esquire
THE LAW OFFICES OF NEIL MORALES, P.A.
2272 Airport Road South, Suite 209
Naples, FL 34112
Tel: (239) 659-5291
Fax: (239) 659-5219
Email: LawOfficeNM@yahoo.com

© Copyright Circa 2015

Initials: ______

**Description(s):**

- Home to be constructed with Nova Homes Standard Features per attached Exhibit C

- Nova Homes and Buyer agree that after consummation of contract signing all prior verbal acknowledgments shall not be considered. All items enclosed within said contract shall be binding

- Lender:________________ Pre-Approval Letter: ☑ Yes ☐ No
(If "No" is checked, Please provide a Pre-Approval Letter within 15 Calender Days of Contract Signing)

- Title Company will be: **Stewart Title**
**4450 Bonita Beach Rd #6**
**Contact: Rosie Perez**
**239-992-3303 - Main**
**maria.perez@stewart.com**

- This contract shall be non-transferable

Customer Signature: ________________ Date: 2-23-2022

Customer Signature: ________________ Date: ________

NOVA HOMES: ________________ Date: ________

Initials: SG____

# EXHIBIT B

NOVA HOMES
OF SOUTH FLORIDA, INC.

DATE: February 22, 2022
CGC 1509431
Model Name= Custom Ibis
Living Area= 2,375 Sq. Ft.
Total Build Area= 3,455 Sq. ft

ADDRESS: 127 GULF PORT
CUSTOMER: SCOTT AND JENNIFER

**Nova Homes of South Florida, Inc. to construct a custom "Ibis" not to exceed 2,375 Sq. Ft. Living with 3,455 Sq. Ft. Total Build. Home to be constructed with Marco Island Standard Features.**

**-Base Price = $715,800**

Pool

- 12'x28' or 336 Sq. Ft. included. Additional Pool water shall be charged at a rate of $100 per additional square feet
- Pool Heater = **$4,300**
- Upgrade covered lanai flooring as well as pool deck to Shell Stone = **$4,200**
- Spa with double spill over = **$18,000**
- Sun Shelf = **$3,800**
- Additional pool deck spanning the entire width of home = **$8,800**
- Mega-view screen enclosure = **$28,000**

Exterior

- 5ft Sidewalk per Marco Island Building Code = **$3,200**
- Circular paver driveway "Nova Homes Selection" = **$16,800**
- Front entry Tongue and Groove Ponderosa Pine Nova Homes selection = **$4,100**
- Covered Lanai Tongue and Groove Ponderosa Pine Nova Homes selection = **$12,200**
- 3'-4" Paver Walkway Nova Homes Selection from Driveway to Garage Main door = **$1,800**
- 24"x72" Fixed Transom in Master Bath = **$1,500**
- 10' Tall 90 Degree Sliding Glass Door = **$18,000**
- Dining Room (3) 3' x 10' Sliding Glass Door = **$10,800**
- Bed #2 8' x 8' Sliding Glass Door = **$5,400**
- Outdoor kitchen to be framed out and finished with stucco, $20 per sq. ft. countertop material allowance, 1 single stainless-steel door under sink, double door stainless steel door under kitchen grill, 30" KitchenAid Built in grill, Moen faucet Trim for Sink = **$14,800**

**Interior**

- Car wash shower design Master Bath = **$5,500**
- Crown Molding in Study = **$1,490**
- Plantation shutters in Study = **$1,764**
- 18" shadow boxes, with LED lighting, above all upper kitchen cabinets = **$8,500**
- Waffle Ceiling in Great Room finished with Paint and Crown Molding = **$10,750**
- Waffle ceiling in Dining Room finished with paint and crown molding = **$4,900**
- Kitchen Island Laminated Edge = **$2,500**
- Kitchen Island Waterfall with $20 per square foot material allowance = **$3,770**
- Master Bath exterior tub wall floor to ceiling tile "Nova Homes Selection" = **$1,800**
- Upgrade Bath #2 from shower/tub to walk-in shower with frameless glass = **Included**
- Powder Room = **$6,000**
- Pocket Door in Bed #3 = **$850**
- French Doors in study = **Included**
- Rough-in for future icemaker not including appliance = **$1,150**
- Oven hood wrapped in shiplap = **$2,800**

Base Price **$715,800 plus** $207,474 **in upgrades, equals to** $923,274

Sign: ________________ Date: 3-10-2022

Builder: ________________ Date: 3-10-2022

# EXHIBIT C

## Site Preparation

- All permits and current Impact Fees *Included*
- Standard lot (80'x 110') Preparation, *Where Applicable, Included*
- Clearing for House, Driveway, Septic, Well & FPL path, *Where Applicable*
- Pilings included up to 16' total length each, *Where Applicable*
- Fill necessary to meet 9' elevation or up to 18" above Center Crown of the road, *Where Applicable, (If NO wetland issues occur) Included*
- Soil Pre-Treated for Termites
- Final Termite, *If required by City/County*
- Compaction test on house pad
- 4 course Stem-Wall *(Per Floor Plan), Monolithic Slab (Per Floor Plan)*
- Standard right of way culvert in compliance with City/County Requirement, *Included*
- Exotic Vegetation Removal for Collier County Inspections *Not Included*
- Dept. of Environmental Protection requests are *Not the Responsibility of the builder*
- City Sidewalk *Not Included*
- Utility connection charges (FPL and LCEC) *Not Included*
- Builder's Risk Insurance during the duration of Construction
- 2-10 Bonded Builders Warranty

## Exterior

- Poured steel reinforced concrete Tie beam
- CBS w/ Deco banding, first floor only, Wood frame on second floor
- Brick pavers on driveway & walkway *(Builder's Selection)*
- Naples Estate Lots, 120' Setback w/ paver driveway *(Builder's Selection)*
- Lanai under Trusses *(If Applicable)*
- Satin Paint - Sherwin-Williams
- Keyless garage door entry with 8' tall door

## Roofing

- Eagle Roofing Tile- Barrel or Flat-Tile
- ⅝" CDX on the Roof
- 6" Gutters included for the whole house
- Cedar Fascia
- Vented Stucco Soffit

## Landscaping

- Lawn Sprinkler system
- Floratam Sod
- Landscaping *(Builder Design)*

## Plumbing

- 50-Gallon Water Heater
- 3-Exterior hose bibs
- Ice maker water line
- Septic system *(If Applicable)* or City Sewer & Water hook up
- Well & Well Equipment (RC System) for entire home or City Water, *Included*

## Electrical

- 200 Amp Service
- Decora Switches and plugs
- Smoke and carbon monoxide detectors *(Per Code)*
- Exterior coach lights on garage
- Pre-wire for Dining Room & Breakfast Room light
- Cable Outlets *(Per Floor Plan)*
- Internet Outlets, *Study Only (Per Floor Plan)*
- Exterior outlets *(Per Floor Plan)*
- Control low voltage panel for TV and Internet
- Ceiling fan rough-in *(Per Floor Plan)*
- Entry doorbell
- LED kitchen lights *(Under Cabinets)*
- Recessed lighting *(Per Floor Plan)*

## Pool Package

- 18' x 50' deck area *(Per Floor Plan)*
- Lanai under trusses if applicable
- Standard Pool, 28' x 12' (336 sq. ft.), depth of 3'- 5' with Petite Pearl finish. *(Spa and Heater, Not-Included)*

## Pool Package contd.

- Pool decking Marco Island: French Pattern, Ivory Travertine *(Builder's Selection)*
- Pool decking Naples: Brick Pavers *(Builder's Selection)*
- 80 linear feet of black chain link fence *Included*

## Windows & Doors

- 8' tall smooth fiberglass insulated Entry Door with Impact Glass Inserts
- 8' tall Solid Core Interior 2-Panel Doors
- 10' tall Sliding Glass Doors (PGT Impact) in Great Room *(Per Plan)*
- 8' tall Sliding Glass Doors (PGT Impact) in Bedrooms *(Per Plan)*
- Tinted Glass on all Windows and Sliding Glass Doors
- Wood window sills
- PGT Impact Glass White or Bronze, Single-Hung Windows *(Insulated)*
- Window Style *(Per Plan)*

## Energy Efficient Features

- R-30 Ceiling Insulation over Living Area
- R-5.0 at Exterior Block Walls of Living Area
- 16-SEER Ruud/ Rheem HVAC (Variable Speed)
- Programmable Digital Thermostat

## Interior

- Square corners throughout the House
- 3 ¼" Door Casing and 7¼" Baseboards
- 7 ¼" Crown Mouldings & Tray ceilings in Living Area
- Wood-Ventilated Shelving in all closets
- Ceiling height *(Per Plan)*
- Ceiling (Flat White), Trim & Doors (2 coats Semi-Gloss White - Sherwin-Williams)
- All walls, (2 coats one color Flat - Sherwin-Williams)
- 10"x40" Porcelain Plank standard layout throughout Entire Home *(Builder's Selection)*

## Kitchen

- Frameless Wood Cabinets (42" Upper) with Designer End Panels
- Tile Backsplash *(Builder's Selection)*
- 3CM Granite/Quartz Counter Tops, $20/sqft. Material Allowance
- Under Mount Double Bowl Sink *(Stainless Steel 40/60)*
- $12,000.00 Kitchen Appliance Allowance
- KitchenAid Stainless Steel Appliances
  - Refrigerator Model KRFC300ESS
  - Dishwasher Model KDTE234GPS
  - Cooktop KECC604BBL
  - Oven/Microwave KOCE500ESS
  - 36" Range Hood, KVWB606DSS
- Moen Faucet Model 7882SRS
- Garbage Disposal, *Included on Sewer Only*

## Bathrooms & Laundry

- Frameless Wood Cabinets (36")
- Master Bath: Tub *(Per Plan)*
- Under Mount Porcelain Sink *(White) 18"x13"*
- Master Bath, Moen Genta Faucet T6708BN
- Pool/Guest Bath, Moen Genta Faucet 6702BN
- Utility/Laundry, Moen Integra Faucet 67315SRS
- Shower/Tub Trim, Moen Genta T2472EPBN
- Comfort- Height Toilets
- 42" Frameless Tall Vanity Mirrors
- 80" Tall Frameless Glass shower enclosure in Master Bath *(Per Plan)*
- 80" Tall Frameless Glass shower enclosure in Guest Bath *(Per Plan)*
- Panasonic Whisper 80 CFM Bathroom Fans
- Shower Area: 12"x24" Tile up to Ceiling
- 14"x18" Recessed Shower Niche in all Bathrooms *Included*
- Shower Floor: 6"x6" Porcelain Tile
- Durock on Shower Walls

SIGNATURE: [signature]

***LAST REVISED 08-24-2021***
****DESCRIPTIONS & MATERIALS SUBJECT TO CHANGE WITHOUT NOTICE***
*****IF ANY OF THE REFERENCED PRODUCT MODELS ARE NOT AVAILABLE IT WILL BE REPLACED BY A SIMILAR MODEL AT THE DISCRETION OF THE BUILDER***


Exhibit D
Sign:
Date:
GARAGE
LAUNDRY
BEDROOM #3
BATH #3
PWDR
WIC
BEDROOM #2
BATH #2
KITCHEN
DINING
COVERED LANAI
ENTRY
FOYER
GREAT ROOM
STUDY
FIREPLACE
MASTER BATH
MASTER SUITE
POOL
SPA
FLOOR PLAN - NOTES
NOVA HOMES
DaveWainscott DESIGNS
FLOOR PLAN WITH NOTES
A4

# EXHIBIT 7

**Deborah Peterson**

**Subject:** Question on move to Florida

**From:** sbeale96@gmail.com <sbeale96@gmail.com>
**Sent:** Monday, February 28, 2022 1:53 PM
**To:** Deborah Peterson <Deborah.Peterson@lmcu.org>
**Subject:** Question on move to Florida

**WARNING:** This email originated outside of LMCU. Do not click links or open attachments unless you know the sender and know the content is safe.

My wife and I are preparing our home located at 6674 Gates Mills Blvd in Gates Mills, OH for sale. We expect to list it in the hot spring real estate market. We both work from home and I travel routinely. We can relocate to Florida without any business interruption.

Scott Beale
Cell – (404) 925-4432

# EXHIBIT 8

March 10, 2022

Doug Martin
Senior Loan Officer
LMCU

Re: Relocation of Primary Residence to Florida

To Whom it May Concern:

I am purchasing land and building a house that will be completed mid-2023. My wife and I intend to relocate our residency to Florida at that time.

Because my primary business is located in Virginia and I currently live in Ohio, my distant relationship and telecommute regiment will not change. Further, my roles and responsibilities at my primary employer, Aery Aviation, as well as my other businesses are sales and general business development. These functions are done over the phone, email and video teleconferences. None of my business entities have bricks and mortar locations that require onsite presence.

I do not anticipate any negative change in my businesses or compensation as a result of my relocation to Florida. In fact, Florida residency will actually improve my net earnings due to no state income tax versus my current arrangement in Ohio.

Please do not hesitate to call me (404) 925-4432 if you have any questions.

Best regards,

Scott Beale

# EXHIBIT 9

INSTR 6236613 OR 6112 PG 3544 E-RECORDED 4/18/2022 8:27 AM PAGES 2
CLERK OF THE CIRCUIT COURT AND COMPTROLLER, COLLIER COUNTY FLORIDA
DOC@.70 $8,750.00 REC $18.50
CONS $1,250,000.00

THIS INSTRUMENT PREPARED BY:
Jennifer M. Tenney, Esquire
Tenney Law, PLLC
1770 San Marco Road, Suite 201
Marco Island, Florida 34145
(239) 610-1101
File: 00606
Consideration: $1,250,000.00
VTS# 163308

NOT A CERTIFIED COPY

# WARRANTY DEED

This Indenture made this 19 day of March 2022, between **Ryan Vander Heiden and Dawn Vander Heiden, husband and wife, GRANTOR**, whose post office address is: 2594 112th Ave., Wheatland, IA 52777, and **Scott A. Beale, GRANTEE**, whose post office address is: 8211 Lakeshore, Mentor, OH 44060.

WITNESSETH, that the Grantor, for and in consideration of the sum TEN DOLLARS, and other good and valuable considerations to said GRANTOR in hand paid by said GRANTEES, the receipt whereof is hereby acknowledged, has granted, bargained and sold to the said Grantees, and Grantee's heirs and assigns forever, the following described land, situate, lying and being in the County of Collier, State of Florida, to wit:

> **Lot 10, Block 94, MARCO BEACH UNIT THREE, a subdivision according to the plat thereof as recorded in Plat Book 6, Pages 17 through 24, of the Public Records of Collier County, Florida.**
>
> Subject to restrictions, reservations and easements of record and taxes for the year 2022 and subsequent years.
>
> Tax Folio Number: 56865440008
>
> TO HAVE AND TO HOLD, the same in fee simple forever.
>
> SUBJECT PROPERTY IS VACANT LAND AND IS NOT THE HOMESTEAD OF THE GRANTOR, NOR IS IT CONTIGUOUS TO THE GRANTOR'S HOMESTEAD.

AND the Grantor does hereby fully warrant the title to the land and will defend the same against the lawful claims of all persons whomsoever.

IN WITNESS WHEREOF, Grantor has hereunto set Grantor's hand and seal the day and year first above written.

Signed, sealed and delivered as to both in the presence of:

Keri Matzen
Signature of Witness No. 1

Keri Matzen
Printed Name

Kelly Mente
Signature of Witness No. 2

Kelly Mente
Printed Name

Ryan Vander Heiden
**Ryan Vander Heiden**

Dawn Vander Heiden
**Dawn Vander Heiden**

NOT A CERTIFIED COPY

**STATE OF** Iowa
**COUNTY OF** Clinton

The foregoing instrument was acknowledged before me, by means of ☑ physical presence or ☐ online notarization, this 19 day of March 2022, by **Ryan Vander Heiden and Dawn Vander Heiden,** who are personally known to me or who presented Drivers License as identification and did (did not) take an oath.

Brenda K Kay
**Notary Public Signature**

Brenda K Kay
**Notary Public Printed Name**

(NOTARY STAMP SEAL)

NOTARIAL SEAL IOWA
BRENDA K KAY
Commission Number 721541
My Comm. Exp. 3-21-24

# EXHIBIT 10

*** INSTR 6305388 OR 6171 PG 471 E-RECORDED 9/7/2022 8:58 AM PAGES 1 ***
CLERK OF THE CIRCUIT COURT AND COMPTROLLER, COLLIER COUNTY FLORIDA
REC $10.00

Collier County
Growth Management Department
2800 N. Horseshoe Dr., Naples FL 34104 | 239-252-2400

Notary Public State of Florida
Bernice M Clark
My Commission GG 943040
Expires 02/18/2024

# NOTICE OF COMMENCEMENT

State of FLORIDA
County of COLLIER

**A. Permit No.** ______ **B. Parcel/Tax Folio No.** 56865440008

1. Description of Property (legal description of the property, and street address if available): 127 Gulfport Ct, Marco Island, FL 34145 - Marco Beach Unit 3 Block 94 Lot 10
2. General description of improvement (must be work scope specific and match the Permit): Build concrete seawall
3. Owner information or Lessee information if Lessee contracted for the improvement: a. Name: Scott Beale
   b. Address: 8211 Lakeshore, Mentor, OH 44060
   c. Interest in property: Owner/Trustee
   d. Name and address of fee simple titleholder (if different from Owner listed above): N/A
4. Contractor information a. Name: Imperial Marine Construction, Inc
   b. Contractor's Address: 601 E Elkcam Cir, Unit B2, Marco Island, FL 34145
   c. Contractor's Phone Number: 239-272-3152
5. Surety ◯ Yes ◉ No (if applicable, a copy of the payment bond is attached): a. Name: ______ ☑ N/A
   b. Address: N/A ☑ N/A
   c. Phone Number: ______ ☑ N/A
   d. Amount of Bond: $ ______ ☐ N/A
6. Lender information a. Name: ______ ☐ N/A b. Phone: ______ ☑ N/A
   c. Lender's Address: ______ ☑ N/A
7. Persons within the State of Florida designated by Owner upon whom notices or other documents may be served as provided by Section 713.13(1)(a)7. a. Name(s): ______ ☑ N/A
   b. Address: ______ ☑ N/A
   c. Phone Numbers of designated persons: ______ ☑ N/A
8. a. In addition to himself or herself, Owner designates ______ ☐ N/A of ______ ☑ N/A to receive a copy of Lienor's Notice as provided in Section 713.13(1)(b), Florida Statutes.
   b. Phone Number of person or entity designated by owner: ______ ☑ N/A
9. Expiration date of notice of commencement (the expiration date will be 1 year from the date of recording unless a different date is specified): ______

**WARNING TO OWNER**

ANY PAYMENTS MADE BY THE OWNER AFTER THE EXPIRATION OF THE NOTICE OF COMMENCEMENT ARE CONSIDERED IMPROPER PAYMENTS UNDER CHAPTER 713, PART I, SECTION 713.13, FLORIDA STATUTES, AND CAN RESULT IN YOUR PAYING TWICE FOR IMPROVEMENTS TO YOUR PROPERTY. A NOTICE OF COMMENCEMENT MUST BE RECORDED AND POSTED ON THE JOB SITE BEFORE THE FIRST INSPECTION. IF YOU INTEND TO OBTAIN FINANCING, CONSULT WITH YOUR LENDER OR AN ATTORNEY BEFORE COMMENCING WORK OR RECORDING YOUR NOTICE OF COMMENCEMENT.

Maria Montanez
Signature of Owner or Lessee, or Lessee's Authorized Officer/Director/Partner/Manager

Maria Montanez
Signatory's Printed Name and Title/Office

The foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization this 6 day of September, 2022 by Maria Montanez (name of person) as Agent (type of authority, e.g. officer, trustee, attorney in fact) for Scott Beale (name of party on behalf of whom instrument was executed).

**CRYSTAL K. KINZEL, CLERK OF THE CIRCUIT COURT & COMPTROLLER**

______
(Signature of Deputy Clerk)

______
(Printed Name of Deputy Clerk)

BMClark
(Signature of Notary Public - State of Florida)

BERNICE M Clark
(Print, Type, or Stamp Commissioned Name of Notary)
**Personally Known** X **OR Produced Identification** ______
**Type of Identification Produced** N/A

NOT A CERTIFIED COPY

# EXHIBIT 11

*** INSTR 6341166 OR 6199 PG 417 E-RECORDED 12/15/2022 4:24 PM PAGES 1 ***
CLERK OF THE CIRCUIT COURT AND COMPTROLLER, COLLIER COUNTY FLORIDA
REC $10.00

Collier County
Growth Management Department
2800 N. Horseshoe Dr., Naples FL 34104 | 239-252-2400

Notary Public State of Florida
Dachely Gonzalez
My Commission HH 094549
Expires 02/17/2025

# NOTICE OF COMMENCEMENT

State of FLORIDA
County of COLLIER

NOT A CERTIFIED COPY

**A. Permit No.** ______ **B. Parcel/Tax Folio No.** 56865440008

1. Description of Property (legal description of the property, and street address if available): 127 GULFPORT CT / MARCO BCH UNIT 3 BLK 94 LOT 10 OR 1359 PG 2342
2. General description of improvement (must be work scope specific and match the Permit): New Single Family Home WPool and Screen Enclosure
3. Owner information or Lessee information if Lessee contracted for the improvement: a. Name: SCOTT A BEALE
   b. Address: 8211 LAKESHORE
   c. Interest in property: Home Owner
   d. Name and address of fee simple titleholder (if different from Owner listed above): ______
4. Contractor information a. Name: Nova Homes of South Fl
   b. Contractor's Address: 3825 Beck Blvd #703 Naples, Fl 34114
   c. Contractor's Phone Number: 239-307-6116
5. Surety ◯ Yes ◉ No (if applicable, a copy of the payment bond is attached): a. Name: ______ ☑ N/A
   b. Address: ______ ☑ N/A
   c. Phone Number: ______ ☑ N/A
   d. Amount of Bond: $ ______ ☑ N/A
6. Lender information a. Name: ______ ☑ N/A b. Phone: ______ ☑ N/A
   c. Lender's Address: ______ ☑ N/A
7. Persons within the State of Florida designated by Owner upon whom notices or other documents may be served as provided by Section 713.13(1)(a)7. a. Name(s): ______ ☑ N/A
   b. Address: ______ ☑ N/A
   c. Phone Numbers of designated persons: ______ ☑ N/A
8. a. In addition to himself or herself, Owner designates ______ ☑ N/A of ______ ☑ N/A to receive a copy of Lienor's Notice as provided in Section 713.13(1)(b), Florida Statutes.
   b. Phone Number of person or entity designated by owner: ______ ☑ N/A
9. Expiration date of notice of commencement (the expiration date will be 1 year from the date of recording unless a different date is specified): ______

**WARNING TO OWNER**

ANY PAYMENTS MADE BY THE OWNER AFTER THE EXPIRATION OF THE NOTICE OF COMMENCEMENT ARE CONSIDERED IMPROPER PAYMENTS UNDER CHAPTER 713, PART I, SECTION 713.13, FLORIDA STATUTES, AND CAN RESULT IN YOUR PAYING TWICE FOR IMPROVEMENTS TO YOUR PROPERTY. A NOTICE OF COMMENCEMENT MUST BE RECORDED AND POSTED ON THE JOB SITE BEFORE THE FIRST INSPECTION. IF YOU INTEND TO OBTAIN FINANCING, CONSULT WITH YOUR LENDER OR AN ATTORNEY BEFORE COMMENCING WORK OR RECORDING YOUR NOTICE OF COMMENCEMENT.

Scott Beale Digitally signed by Scott Beale Date: 2022.12.15 05:57:43 -05'00'
Signature of Owner or Lessee, or Lessee's Authorized Officer/Director/Partner/Manager

Scott Beale
Signatory's Printed Name and Title/Office

The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online notarization this 15 day of December, 2022 by Scott Beale (name of person) as Owner (type of authority, e.g. officer, trustee, attorney in fact) for ______ (name of party on behalf of whom instrument was executed).

**CRYSTAL K. KINZEL, CLERK OF THE CIRCUIT COURT & COMPTROLLER**

______
(Signature of Deputy Clerk)

Dachely Gonzalez
(Signature of Notary Public - State of Florida)

Dachely Gonzalez
(Print, Type, or Stamp Commissioned Name of Notary)

**Personally Known** ______ **OR Produced Identification** /
**Type of Identification Produced** Driver License

______
(Printed Name of Deputy Clerk)

# EXHIBIT 12

INSTR 6458387 OR 6291 PG 3777 E-RECORDED 9/29/2023 8:25 AM PAGES 2
CLERK OF THE CIRCUIT COURT AND COMPTROLLER, COLLIER COUNTY FLORIDA
DOC@.70 $3,850.00 REC $18.50
CONS $550,000.00

Prepared by and return to:
Mari Menendez
Venture Title Services
1421 Pine Ridge Rd
STE 110
Naples, FL 34109
(239) 734-2400
File No 186828

Parcel Identification No 79904121582

[Space Above This Line For Recording Data]

NOT AUTHENTICATED COPY

# WARRANTY DEED

(STATUTORY FORM – SECTION 689.02, F.S.)

**This indenture** made the **27th day of September, 2023** between **Janie Alexander and Kevin Alexander, wife and husband**, whose post address is **15991 Northeast 243rd Place Road, Fort McCoy, FL 32134**, of the County of Marion, State of Florida, Grantors, to **Christine Renee Lannon, an unmarried woman, and Scott A. Beale, a married man, as tenants in common**, whose post address is **1235 Wildwood Lakes Boulevard, 106, Naples, FL 34104,** of the County of Collier, State of Florida, Grantees :

**Witnesseth**, that said Grantors, for and in consideration of the sum of TEN DOLLARS (U.S.$10.00) and other good and valuable considerations to said Grantors in hand paid by said Grantees, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said Grantees, and Grantees' heirs and assigns forever, the following described land, situate, lying and being in Collier, Florida, to-wit:

Lot 586, VERONAWALK TOWNHOMES PHASE TWO, according to the plat thereof, as recorded in Plat Book 42, Pages 44 through 46, of the Public Records of Collier County, Florida.

**Together with** all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**Subject to** taxes for 2023 and subsequent years, not yet due and payable; covenants, restrictions, easements, reservations and limitations of record, if any.

**TO HAVE AND TO HOLD** the same in fee simple forever.

**And** Grantors hereby covenant with the Grantees that the Grantors are lawfully seized of said land in fee simple, that Grantors have good right and lawful authority to sell and convey said land and that the Grantors hereby fully warrant the title to said land and will defend the same against the lawful claims of all persons whomsoever.

**In Witness Whereof,** Grantors have hereunto set Grantors' hand and seal the day and year first above written.

*Signed, sealed and delivered in our presence:*

WITNESS
PRINT NAME: TRICIA STADALSKY

WITNESS
PRINT NAME: Kenneth Stadalsky

Janie Alexander

Kevin Alexander

STATE OF FLORIDA
COUNTY OF Collier

The foregoing instrument was acknowledged before me by means of (✓) physical presence or ( ) online notarization this 27th day of September, 2023, by Janie Alexander and Kevin Alexander.

Signature of Notary Public
Print, Type/Stamp Name of Notary

KENNETH STADALSKY
Notary Public - State of Florida
Commission # HH 189838
My Comm. Expires Oct 21, 2025
Bonded through National Notary Assn.

Personally Known:_________ OR Produced Identification: X
Type of Identification
Produced: Drivers License

NOT A CERTIFIED COPY

# Collier County Property Appraiser
# Summary

| Parcel ID | 79904121582 | Site Location | 8334 RIMINI WAY, NAPLES 34114 |
|---|---|---|---|

| Name / Address | LANNON, CHRISTINE RENEE | | | | |
|---|---|---|---|---|---|
| | SCOTT A BEALE | | | | |
| | 1235 WILDWOOD LAKES BLVD #106 | | | | |
| City | NAPLES | State | FL | Zip | 34104 |

| Legal | VERONAWALK TOWNHOMES PHASE TWO LOT 586 | | | | |
|---|---|---|---|---|---|
| Sub./Condo | 690195 - VERONAWALK TOWNHOMES PH 2 | | | | |
| Use Code | 1 - SINGLE FAMILY RESIDENTIAL | Millage Area | 76 | Municipality | UNINCORPORATED |

| Map No. | Strap No. | Section | Township | Range | Acres *Estimated |
|---|---|---|---|---|---|
| 5B26 | 690195 5865B26 | 26 | 50 | 26 | 0.09 |

## Latest Sales History

(Not all Sales are listed due to Confidentiality)

| Date | Book-Page | Amount |
|---|---|---|
| 09/27/23 | 6291-3777 | $550,000 |
| 03/13/07 | 4196-2682 | $386,100 |

## 2025 Preliminary Tax Roll

(Ad Valorem Only, Non-Ad Valorem After Certification)

| Just Values | | Amount |
|---|---|---|
| Land | | $142,877 |
| (+) Improvements | | $200,044 |
| (=) Total Just | | $342,921 |
| Assessed Values | | |
| (=) Assessed | | $342,921 |
| Taxable Values | Millage Rates | |
| (=) Taxable | 10.5058 | $342,921 |
| Tax Amounts | | |
| Ad Valorem Taxes | | $3,602.67 |
| (=) Total Tax | | $3,602.67 |

**Important:** This is not a tax bill. Preliminary values are subject to change. Ad valorem taxes shown are proposed only. Non-ad valorem assessments are not included in preliminary figures and will be posted after certification by the levying authorities. Do not rely on current taxes to estimate taxes after a change in ownership. A transfer may significantly affect the taxable value due to loss of exemptions, reset of Save Our Homes or the 10% Cap, and/or market changes. Use our Tax Estimator to estimate taxes under new ownership. Values reflect conditions as of January 1st each year and may differ from the actual tax bill due to millage changes or additional non-ad valorem assessments. For the most accurate and up-to-date tax information, please visit the Collier County Tax Collector's Office.